In the Matter of the Accounting of BANK OF NEW YORK, as Trustee of its DISCRETIONARY COMMON TRUST FUND "A".*

Surrogate's Court, New York County, December 4, 1946.

* See, also, *Matter of Security Trust Co. of Rochester,* 189 Misc. 748.— [REP.

*Vaughan & Lyons* for Bank of New York, as trustee, petitioner.

*Charles F. Evans*, special guardian and attorney for infants and others having an interest in the principal or capital, respondent.

*James J. Beha,* special guardian and attorney for infants and others having an interest in the income of the common trust fund, respondent.

DELEHANTY, S.  Pursuant to subdivision 10 of section 100-c of the Banking Law petitioner filed an account of its proceedings as trustee of a discretionary common trust fund which it denominates by the letter " A ". With the account petitioner filed a petition asking for its settlement and asking for instructions in respect of many matters affecting the operation of the fund.

The matters on which instructions are sought require some general discussion of the nature of a common trust fund. Authority for the establishment of a " legal " common fund in this State was granted by chapter 687 of the Laws of 1937. These provisions were amended by chapter 602 of the Laws of 1943 and by chapter 158 of the Laws of 1944. As the law now stands the operation of a so-called discretionary common trust fund is permissible. Though the fund now being accounted for is a discretionary one, many of the points raised in the requests for instructions are equally applicable to a so-called legal trust fund and the discussion which follows is applicable to either class of fund.

While the idea of the common trust fund first had legislative sanction in this State in 1937 such funds were operated elsewhere prior to the enactment of. our statute. The principle which underlies the idea of the common trust fund had long been extant in the investment field. Large aggregations of investment funds had found employment in investment trusts. And in a sense the

operation of mutual insurance companies and mutual savings banks partook of the nature of a common trust fund. In both the cited instances the managers of the enterprises were dealing with other people's contributions and were managing investments made possible only by the aggregate of multiple deposits into a common fund. The benefits to depositors in such enterprises were represented by the interest paid on savings deposits in the one case and by the assurance to policyholders in the other case of the ability of the insurance company to honor its contracts when they came due and in the interval to keep the cost of insurance at as low a figure as was consistent with safety. This factor of safety was demonstrated to be present when the area of investment was widely diversified.

· The acid test of the depression during the 1930's had made clear to the Legislature and to the managers of investment funds that the supposed safety inherent in guaranteed mortgage participations was wholly illusory. Legislative authority had permitted investment of trust funds in this field and there was widespread use of the mortgage participation as a ready method of investing small funds. The depression demonstrated the grave danger of concentrating funds in one type of investment.

It was against that background that the Legislature considered the experience with common trust funds in other States, the experience generally in the operation of voluntary investment trusts and the record of insurance companies, when it was asked in 1937 to enlarge the area of permissible investments by trustees. The first legislative step was limited to a grant of authority to erect and manage common funds which were authorized to invest only in securities otherwise legal for trustees. Because of a natural hesitancy of banks to enter into this new field and because also of difficulties under the internal revenue acts which had to be removed, no steps were taken under the law as it was originally enacted. When the financing of the war effort made United States Government securities readily available in the market on a basis which competed in return with the income available on so-called " legals " there was no longer any reason to experiment with a " legal " common fund which promised no added benefit to estates in the management of corporate fiduciaries. As a consequence it was only when amendment of the Banking Law permitted the creation of discretionary common trust funds that steps were taken to put the common trust fund into actual operation.

From the viewpoint of trust administration that· idea finds justification in the fact that the existence of a common trust

fund furnishes a ready means of investing small amounts of money with the same assurance of safety as can be had from that diversification of risk which a large investment can secure for the investor. To secure that safety for persons interested in estates the Legislature validated the idea of a common trust fund for trust investments. The legislation dealt with the subject of commingling and self-dealing in relation to such a fund and assured the corporate fiduciary managing such a fund against criticism based solely on the act of investing in such fund moneys held by the fiduciary as such. The Legislature made sure by its provisions that the fund would not be used by the fiduciary for its own corporate investments and that there would be no opportunity to load the fund with securities promoted by the operating bank. It gave to the Banking Board large discretion in the matter of rules and supervision so as to assure the propriety of the administration of such a fund.

In sum, the legislation was designed to provide a new category of authorized trust investments. A new agency for aggregating multiple interests was created and regulated and shares in it were made lawful for investment by trustees. This concept of the common trust fund requires the court to deal with such a fund as an entity separate from the trustee and separate from the individual estates whose moneys are invested in participations in the fund. Having this concept of the fund the court deals with the questions presented in this accounting.

The first question has to do with the charging of the expenses of the accounting and the *time* of such a charge. In this connection it is necessary to refer to subdivision 4 of section 100-c of the Banking Law and to section 8 of article 10 of regulation 11 of the Regulations of the Banking Board. These say that no commissions or compensation can be taken by the corporate fiduciary for management. The regulation says that nothing in the prohibition against compensation for management shall prohibit the payment of reasonable expenses. The first question is whether or not the expenses of an accounting are a " charge against such fund for the management thereof " within the terms of the statute and the regulations. The court holds that the ordinary expenditure for the court accounting which is prescribed by statute may be paid out of the common fund and is not a " management " charge.

The next question has to do with the source of payment of such charges. The special guardian appointed for principal account argues that the income account of the common trust

fund should bear some part at least of the expense of the accounting. The special guardian for income contends that the charge must be borne wholly by principal since that is the only practicable method for making the charge and since such a charge would ultimately result in an income contribution by reason of diminution of the fund upon which income is earned. The court is of the view that the charges must be borne wholly by principal account. The cost to principal is not great. If loaded even in part on income the burden would be disproportionate. But in any event the concept of the fund as an entity requires that the charge be made to principal and so the court rules.

The next question concerns the *time* of making the charge. It is pointed out that in the operation of such a fund it may well happen that between accountings participations will come in and go out with the result that in some instances a particular investor might escape wholly or in part the charges which other participants had to bear. Perhaps such instances will occur. If they do occur they are a necessary incident to the operation of the fund as an entity. It would be impracticable to attempt to allocate the charges by relating them to the individual participations and the periods of time during which each investor had a participation. As a practical matter the fund could not be operated under such conditions. The Legislature must be deemed to have so understood. If there be adventitious benefit to some participant it would be unimportant in the long run. In the case of a fund as large as the one here accounted for the the costs of administration are relatively negligible. The impact of such costs when translated into individual units is trivial. The fund is a means of investment which must be operated on a practical basis or not at all. For many reasons the court holds that the time of charge is the time of the decree settling the account. To choose any other date would complicate the operation of the fund, would suspend the final valuation of withdrawn participations or new participations and would impose upon the manager of the fund bookkeeping and accounting problems which would make the fund unworkable. The quarterly valuations required to be made under the act could not be definitively made if the time of the charge were to be made that of the closing date of the account, and could not be definitively made if there were to be ordered a reservation for expenses. Such a reserve would impose on the fund accounting charges out of proportion to the result to be achieved by such a method. The simple and effective procedure is to make the charge operative at the date

of the decree without any reserve and without any contributions from participations theretofore withdrawn from the fund.

The next question has to do with the amortization of premiums paid on securities purchased by the operator of the common trust fund. The plan of operation of the accounting party says in terms that the premiums shall not be amortized. The special guardians are again in disagreement. The income guardian is of course content that no amortization be had. The guardian for principal account asserts that amortization must be had if principal account is to be fairly treated. He argues, too, that the trustee of the common fund should not be permitted to operate the fund in such manner as to deprive the participants in the fund of the benefits which principal account would have if the purchase were made in the participating estate rather than in the common fund. Again the problem is whether the investment is to be deemed an investment for the participating estate and fund or is to be deemed an investment by a wholly separate entity.

On this point subdivision 2 of section 100-c is pertinent. That subdivision provides: " * * * No fiduciary of any estate, trust or fund having any such share or interest in a common trust fund nor any person having an interest in any such estate, trust or fund shall have or be deemed to have any ownership in any particular asset or investment of such common trust fund. The ownership of such individual assets and investments of the common trust fund shall be in the trust company as trustee of such fund." The plan of operation in express terms asserts complete ownership of all assets in the common fund by the trustee of the fund; and expressly negates any interest in any particular investment by any participant. Again the court reverts to the basic factors which led the Legislature to authorize a common trust fund and it finds that the tenor of the legislation when read against that background requires a holding that the common trust fund is an entity operating its own investments and unconcerned with any principle of amortization which might be applicable under wills or trust agreements if the investment were made by the participating estate or fund. On the basis of that holding no question of amortization ever arises.

The court notes the argument of the special guardian for principal account which is based upon his contention that the realized decreases in capital assets of the fund has resulted almost entirely from redemption of bonds purchased at a premium. Such losses from redemptions are in part absorbed by capital gains and the existence of both aspects of possible fluc-

tuation in principal value points up the need for treating the fund as an entity which takes its gains and absorbs its losses. The court is in agreement with a commentator who said in relation to a common trust fund: " In such a fund, comprising a great many bonds bought at varying prices, discounts and premiums tend approximately to cancel out over a reasonably short period. To require amortization, moreover, would seriously (and unnecessarily if ' cancelling-out ' occurs) complicate the already sufficiently complex accounting of a common trust fund." (37 Col. L. Rev. 1384, 1391.) Having determined that no amortization is required in the case of a common trust fund the request for instructions as to the method of amortization requires no answer.

The next point which requires discussion has to do with stock dividends. It appears that at least in one instance an investment in the common fund has been made by the trustee under a deed of trust effective in 1926 or earlier. In that deed of trust no mention is made of stock dividends. The instrument antedates the enactment of section 17-a of the Personal Property Law. The query is whether the plan of operation which requires that stock dividends be credited to principal is effective in the case of the participant just mentioned. The question in principle has been answered by the discussion on amortizations. There is the same controversy between the special guardians. But since under the law and the plan no participant has any ownership in any asset, there is no right in any participant to have a stock dividend. The participant has only his interest in the fund and its income as established by the statute, the Banking Board Regulations and the plan of operation of the fund. The placing of stock dividends in the capital of the fund is entirely valid.

The next question which is presented by the petition concerns the maximum amount which may be invested by a participant. The limitations fixed by law and by the Banking Board are not questioned. The point in issue is whether participations up to the maximum so authorized may be made if the same settlor in an *inter vivos* trust or the same testator in a testamentary trust has erected more than one trust under the same instrument. In this connection the applicable Banking Board regulation says (regulation 11, art. 3, § 2): " * * * if two or more trusts are created by the same settlor or settlors and as much as one-half of the income or principal or both of each trust is payable or applicable to the use of the same person or persons, such trusts shall be considered as one." Petitioner does not question the authority of the Banking Board or the validity of

the regulation but asks that the regulation be interpreted. It desires to know whether the regulation is applicable, for instance, when an income beneficiary of one trust has a vested or contingent interest in the remainder of another trust. It is a common experience that a testator may erect separate trusts for each of his children with income payable to the respective beneficiaries and with corpus payable to their issue or, lacking issue, to the other children. In such a situation each income beneficiary has a contingent interest in the principal of each other such trust.

In interpreting its own regulation, the Banking Board has adopted the " presently payable " test. Under such a test the contingent or vested interest in a remainder of a continuing trust would not require consolidation of the trusts nor the limitation on investments which the text of the regulation might otherwise invoke. The court holds that the " presently payable " test is the test to be applied. It holds that the fact that a single instrument is the source of authority for more than one trust does not itself limit the investments of all such trusts to the total of $50,000 now prescribed as the maximum for one participation. If under the " presently payable " test the trusts are separate each trust may take a participation up to the maximum. This ruling is made on the basis of the regulation and the interpretation of it by the Banking Board. The court deems the power of the Banking Board sufficiently broad to authorize a variation in its regulation in respect of this subject matter. The board in the future may make the restriction more onerous than it now is, if experience in the operation of common trust funds so suggests.

On this same point there is raised a subsidiary question which arises by reason of the text of the second sentence of subdivision 1 of section 100-c of Banking Law. The opening phrase of such subdivision refers to " the instrument " in the text which broadly authorizes investment in a common trust fund. Petitioner wants to know whether the use of such quoted words compels a stricter rule than the one just outlined. The court holds that the reference to " the instrument " is intended only to refer to the source of authority to invest in a fund and the reference to " the instrument " does not limit the investments. The entire subdivision in which the quoted words appear indicates that the Legislature intended to require ascertainment whether investment was permissible at all when it used these words. When such permission was found in " the instrument ", the other provisions of the statute and the regulations became

operative and multiple investments are permissible if separate trusts are created by " the instrument " and if such investments do not conflict with the Regulations of the Banking Board.

Another problem is presented by the petition which asks whether participations in the fund may be paid for by the participant by exchange of United States Bonds, Series G, at par. Such bonds are issued at par and interest thereon is paid semiannually at the annual rate of 2½%. The bonds mature in twelve years and only at maturity date may they be redeemed at par. If offered for redemption at any time after six months from issue date and before maturity the principal sum payable is less than par. This diminution in capital value is no doubt intended to prevent the use of these bonds as short-term investments. Petitioner reports that the United States Treasury has advised it that any Series G Bonds acquired on original issue by a trust or fund which seeks to exchange them for participations in the common fund will be reissued to petitioner as trustee of such common fund at par without loss of capital value. In these circumstances no one can be prejudiced by the method of payment for participations which petitioner outlines. The participating trusts have the advantage of being able to exchange their bonds at par for units of participations in the common fund. The common fund gains a prime investment with a maturity shorter than if it had purchased the same investment from the government. Petitioner states that the Treasury Department's willingness to reissue to the trustee of the common fund bonds theretofore held by participants does not affect the amount of bonds which the trustee of the common fund under Federal regulations may otherwise subscribe for. The effect of a validation of the practice is to bring into the discretionary fund a volume of sound securities on which no loss can ever be sustained if the securities are held to maturity. The procedure followed by petitioner is proper and is approved by the court.

Another question has to do with these Series G Bonds. Petitioner wants to know whether they should be valued on the quarterly valuation dates on the basis of their then redemption value if turned in for redemption or on the basis of cost which, under petitioner's practice, is par. Petitioner has elected to carry the bonds at cost and has used that figure in the valuations required by the statute. Petitioner justifies that method of treating the bonds on the basis of their intrinsic worth and on the fact that they cannot be bought and sold in a general market and are redeemable only by the Gov-

ernment. These factors are urged as justification for treating such bonds as worth par. The court finds no reason to question the procedure of petitioner. If it directed petitioner to carry the bonds at redemption values, it would in effect give a bonus to new participants in the fund since these bonds would then be bound to rise in value if held to maturity. If the court directed that redemption value be used, it would compel a withdrawing participant to take a discounted value for its unit though in fact no actual redemption of the bonds had occurred. Every practical reason operates to validate the practice of the petitioner and the court approves it.

In addition to the questions raised by petitioner some are raised also by the special guardians. They have examined the instruments which created the trusts or funds participating in the common fund. In some instances the texts of such underlying instruments raise queries which the special guardians respectively think the court should answer. One of these queries raises issue as to whether the underlying instrument in fact warrants an investment in a common trust and another raises question whether a fiduciary which holds a power in trust is within the class of fiduciaries entitled to invest in such a common fund. One of the questions so posed by the special guardians would require the construction by this court of an *inter vivos* deed of trust. The other would require the court to construe a will though the record is not clear whether the estate of the testator is pending in this county. The fact that the questions raised involve a construction of these respective instruments immediately poses the question whether on the present record such a construction should be had. The court thinks it should not. The statute creates a wholly separate entity as the court has repeatedly said. It has granted to the manager of this entity power to receive funds and to administer them in common within the limits of the statute and subject to the Regulations of the Banking Board. The statute requires notice of the first investment in such a fund to be sent to persons interested in the participating estate or fund and such persons are granted the right to examine the plan of operation. In the accounting the trustee is required to list the participating estate's trusts or funds with proper identification but is not required to cite the persons interested in the individual participating trusts or funds. The manner of notice is by publication. There are rights granted of personal appearance by individuals and there is statutory representation of nonappearing individuals through the respective special guardians. This accounting

plan is designed to enable judicial scrutiny to be made under proper auspices of the management of the entity created by the statute and regulated by the Banking Board. It is not a substitute for an accounting in the underlying estates, trusts or funds.

When individual accountings in individual estates or funds are had, it will be appropriate to construe the underlying instruments creating such trusts or funds. Here the court should and does limit itself to ascertainment whether the trustee of the common fund has properly accounted for all of the assets received by it and has properly managed the fund so as to secure to participants their rights in principal and income thereof.

The compensation of the attorneys for petitioner is fixed in the amount requested.

Submit, on notice, decree settling the account accordingly.