In the Matter of the Accounting of BANK OF NEW YORK, as Trustee under the Will of ELLA J. HOAGLAND, Deceased.

Surrogate's Court, New York County, May 26, 1947.

*Emmet, Marvin & Martin* for trustee, petitioner.

*Thomas A. Ryan* for Bank of New York, as surviving executor of Ella J. Hoagland, deceased, and as surviving executor of Elizabeth H. Gates, deceased, and others, respondents.

*Albert W. Meisel* for Sevilla-Hopewell Society and another, respondents.

*Curtis, Mallet-Prevost, Colt & Mosle* for Sevilla Home for Children, respondent.

*Vaughan & Lyons* for Bank of New York, as trustee of discretionary trust fund " A " of Bank of New York, respondent.

*Nathaniel L. Goldstein, Attorney-General* (*P. Hodges Combier* of counsel), for People of State of New York, respondent.

*Frueauff, Burns, Ruch & Farrell* for Violet T. Cottrell, respondent.

DELEHANTY, S. In this accounting proceeding a construction of subdivision 10 of paragraph second of deceased's will is necessary. That subdivision says: " To the Bank of New York and Trust Company, located at No. 52 Wall Street, in the Borough of Manhattan, City of New York, the sum of Twenty-five thousand ($25,000.00) Dollars, in trust, nevertheless, to invest and reinvest the same, and to collect the rents, issues and profits thereof, and to pay over quarterly the net income derived therefrom to ' Summerland ', as long as it continues to be operated independently as the Summer home for children under the auspices of the Hopewell Society, No. 218 Gates Avenue, Brooklyn, N. Y. If ' Summerland ' shall cease to be operated independently as the Summer home for children under the auspices of the Hopewell Society, No. 218 Gates Avenue, Brooklyn, N. Y., this trust shall cease, terminate and come to an end, and the principal thereof shall then be paid over to my Executors and form a part of my residuary estate."

The quoted text is to be considered against a background of facts put into the record by agreement of the parties and summarized as follows: A special act of the Legislature in 1870 (L. 1870, ch. 472) authorized the organization in New York of a charitable corporation under the name " The Society for the Aid of Friendless Women and Children ". Deceased was a member of the board of managers of the Society which had its headquarters in Brooklyn. At its headquarters the Society cared for persons who came within the purview of its charter. Among these persons were children who were cared for in the headquarters of the corporation during the greater part of the

year and for whom a summer home called "Summerland" was provided on a rented farm in New Jersey. The personnel of the corporation which looked after the children during the greater part of the year went with them to the summer home and there cared for the children just as they did during the rest of the year. Some additional children were taken into the summer home but in general the population of "Summerland" consisted of the children brought from the Brooklyn headquarters of the charity. Deceased was active in this summer vacation enterprise of the charity and was a member of the so-called Summerland Auxiliary of the charity. In 1904, deceased purchased the farm theretofore rented as the site of Summerland and caused it to be conveyed to the Society. In 1920, the Society conveyed the farm to a New Jersey corporation organized by it to take title to the summer facilities of the Society. This was done because it had been found that a New York charitable corporation could not be exempted from the payment of taxes in New Jersey. The New Jersey corporation — known as "Summerland" — adopted by-laws which provided that its president and treasurer should be appointed by the Society and that a written report of all actions taken by the executive committee of "Summerland" were to be reported to the Society at the latter's regular monthly meetings. After this transfer of the New Jersey real estate into the name of the New Jersey corporation the Society changed its name to Hopewell Society of Brooklyn. The supervisory welfare authorities of New York State objected to the placing of New York children in a New Jersey summer home where the New York authorities had no power of inspection. Because of this factor and because the property in New Jersey had become salable at a profit the Hopewell Society determined that the summer facilities for the children in its care should be moved into New York State. The operation of the summer home had been financed right along by the Hopewell Society. Deceased had contributed to these costs and had herself contributed a total of $15,000 toward improvements in the way of permanent structures which had been made on the New Jersey land. In 1928, an opportunity for the sale of the New Jersey property was presented to the Society. At the same time the Society found that it could purchase a desirable piece of property in Rockland County in this State. It thereupon sold the property in New Jersey and invested some $50,000 of the proceeds in the Rockland County site. The actual sale was made by the New Jersey corporation "Summerland" but only after consent of the Hopewell Society

to the sale had been obtained. When the move to New York was under consideration it was discovered that the name "Summerland" had been pre-empted and so the New Jersey corporation "Summerland" changed its name to "Hopewell Summerland". Thereafter the summer facilities were operated in New York under the name "Hopewell Summerland" and, as before, under the general supervision of the Hopewell Society of Brooklyn. By March, 1943, the resources of "Hopewell Summerland" apparently had become so restricted that it decided to turn all its assets back to the parent organization Hopewell Society of Brooklyn. It had received from that Society the assets which produced the capital gain realized on the sale of its original property in New Jersey. Hopewell Summerland was dissolved as a corporation in 1943, and Hopewell Society of Brooklyn assumed all its debts and liabilities and took over all its assets. Such assets as were not represented in the tangible summer facilities in Rockland County were put in the hands of the corporate fiduciary which managed the trust for Summerland under the will of deceased and the proceeds used for maintaining the summer home. The cost of the operation of the camp in recent years has been approximately twice the amount of the income from Hopewell Summerland's facilities and the assets thus administered by the corporate fiduciary. The difference has regularly been donated by the Hopewell Society.

In February of this year the Hopewell Society of Brooklyn and another charity called Sevilla Home for Children were consolidated under appropriate New York law and are now operating as Sevilla-Hopewell Society. The consolidated charity proposes to continue the operation of the summer home.

By the petition the trustees seek to be advised whether the trust terminated prior to the consolidation and, if not, whether the consolidation of the two societies has effected or will effect such termination. A representative of one of deceased's distributees contends that the trust terminated in 1943, when the New Jersey corporation "Hopewell Summerland" was dissolved. This party asserts that the fund is now distributable as intestate property. The executor of the residuary legatee and the persons interested under her will contend that the trust terminated when the New Jersey corporation "Summerland" sold its property in New Jersey in 1928. They contend that the fund was then payable to the residuary legatee who survived deceased by four months. The residuary legatee was also a distributee of deceased but her successors in interest do not

premise their claims on that basis. The consolidated charitable organization contends that the trust is still operative and hence that none of the other claimants to the fund is entitled to any part of it. It is against the background of these respective assertions and the facts already outlined that the court is called on to construe the language used by deceased.

The phrases upon which the argument of the parties centers are those which speak of the operation of Summerland. The first phrase says that the trust income is to be paid over quarterly " to ' Summerland ', as long as it continues to be operated independently as the Summer home for children under the auspices of the Hopewell Society ". The second phrase says: " If ' Summerland ' shall cease to be operated independently as the Summer home for children under the auspices of the Hopewell Society * * * this trust shall cease ". The words — " to be operated independently as the Summer home for children under the auspices of the Hopewell Society " — are repeated and the central question is what deceased meant by that group of words.

In the search for her meaning dictionaries have been consulted. The adverb " independently " is not separately defined in Merriam-Webster's International Dictionary (2d ed.), nor in the Practical Standard Dictionary. By these authorities the word is noted only as an adverb under the definition of the word " independent ". In the Century Dictionary the adverb is defined thus: " In an independent manner; with independence." In this dictionary it is given the secondary meaning: " Apart from or without regard to something else ". Going to the word " independent ", the Merriam-Webster International defines it thus: " 1. Not dependent; as * * * Not subject to control by others; not subordinate; self-governing; sovereign; free * * *. Not relying on others; irrespective of * * * another * * *. 3. Separate; exclusive * * *. 4. Not-dependent for support or supplies ". The Practical Standard Dictionary defines it thus: " 1. Not subordinate or subject to nor dependent for support upon another government, person, or thing. * * * 4. Separate or disconnected." The Merriam-Webster International gives the following synonyms for " independent ": " Uncontrolled, uncoerced, self-reliant, unrestricted."

The dictionary meaning of " auspices " has also been sought. The word is the plural of auspice and of auspex. The primary meaning of both these words relates to divinations by observing the motions, cries, etc., of birds. The secondary meaning is

given as " protection or lead; favoring or propitious influence, patronage; especially in the phrase ' under the auspices of ' ".

If then we take the dictionary meanings of the words used by deceased we find that in the same phrase she speaks of a wholly disconnected, separate, free, uncontrolled, self-supporting and self-reliant activity which is at the same time under the protection, the favoring influence and the patronage of the Hopewell Society. " Patronage " implies both protection and support. Confronted with this essential contradiction in the terms used by deceased (if dictionary meanings are accepted) and with the facts respecting Summerland's dependence on the Hopewell Society the court must find against the background in which deceased wrote her will what concept respecting " Summerland " she intended to express. That " Summerland " was operated under the auspices of the Hopewell Society is apparent. That it was never independent, never uncontrolled, never disconnected, never separate, never self-supporting and never operated apart from and without regard to Hopewell Society is too clear for dispute.

Since there can be no finding of the independence of " Summerland " and no finding that it " operated independently " the court must of necessity hold that what deceased said is not to be taken literally. It holds that her words mean that the trust is to continue and its income is to be paid over so long as " Summerland " continues to be operated in the general manner in which it was operated under deceased's own view and with deceased's own co-operation. She had seen twenty-four years of operation of the home. She had seen it operated by the Summerland Auxiliary of the Hopewell Society and had seen it operated by the very same individuals while the record ownership of the land on which it was operated was in " Summerland ", a New Jersey corporation. In this view of deceased's text it means that the trust is to continue so long as the Hopewell Society lends its aid, its favoring influence, its patronage and its protection to an identifiable summer home for children under the supervision of the Society. In that concept of deceased's meaning neither the place of operation nor the record ownership of facilities is controlling if the summer activity is one operated in a practical sense by the Hopewell Society and identified as one of its activities.

It follows from these considerations that neither the sale of the property in New Jersey nor the removal of the summer facilities to New York State nor the dissolution of the New

Jersey corporation " Hopewell Summerland " affected the life of the trust in any wise.

There remains for consideration only the question whether the consolidation of the Hopewell Society of Brooklyn with the Sevilla Home for Children under the title Sevilla-Hopewell Society operated to terminate the trust. The court holds that such consolidation also had no effect on the life of the trust. Since the will of deceased was executed in 1927 there is applicable thereto the language of subdivision 2 of section 7 of the Membership Corporations Law, as last amended by chapter 327 of the Laws of 1924. Among other things this subdivision then said in respect of a consolidated membership corporation that " such new corporation or the corporation into which another or others are merged shall hold, enjoy and exercise the same and all rights or properties, privileges, franchises and interests of either of the said several corporations in the same manner and to the same extent as the same were or might have been held and enjoyed and exercised by the several corporations so consolidating or so merging." Again, the subdivision said: " any devise or bequest, whether vested, contingent or in expectancy, contained in any last will and testament made before or after such consolidation or such merger to, or for the benefit of any of the corporations so consolidating or so merging shall not fail, by reason of such consolidation or such merger, but the same shall inure to the benefit of the said new corporation or the corporation into which another or others are merged; and the title to all real and personal estate and all rights and privileges acquired and enjoyed by either of the said corporations so consolidating or so merging shall not be deemed to revert or to be impaired by such act of consolidation or merger or anything relating thereto." In the light of this condition of the statute law when deceased wrote her will it must be held that its provisions for the maintenance of a summer home for children do not fail because of the merger. In a statutory sense the activities of the summer home are still under the auspices of the Hopewell Society. The court holds that so long as the consolidated organization supervises and supports a summer home for children in substantially the same manner as " Summerland " was conducted during deceased's lifetime the trust will continue. This conclusion makes unnecessary any discussion of other problems which would arise had the court dealt otherwise with the trust.

An objection made to an investment by the accounting trustee in shares in a discretionary common trust fund managed by

it requires some comment. The text of the will authorizes the trustee " to invest and reinvest in such other securities besides those recognized by law as proper for trustees as my said trustee may deem wise and desirable, it being my wish that said trustee shall not be limited to so-called ' trustees ' investments." Conceding that this text constitutes a dispensation from investment in " legals " the objection is pressed on the ground that a participation in a discretionary common trust fund is not a security. The court holds that such participation is in fact a security as that term is now understood. In the investment field shares in investment trusts are currently bought and sold and are regarded in the market place as securities. A common trust fund is an investment trust in effect. The court holds that the investment is authorized by deceased's will.

A separate objection requires comment on the matter of amortization of premiums paid for securities purchased by the common trust fund. Assertion is made that an adjustment of such premiums should be effected in this particular trust administration, whatever the difficulty in making it, since the trustee of the common fund could have avoided the purchase of investments at a premium. While the form of the objection does not in terms say that the subject matter is open here despite any accounting for the common trust fund itself the court regards the objection as raising issue respecting the court's jurisdiction over such a fund and respecting the effect of a decree settling an account for such a fund. The subject matter of amortization within a common fund was discussed by this court in *Matter of Bank of New York* (189 Misc. 459) and in *Matter of Continental Bank & Trust Co. of N. Y.* (189 Misc. 795). The court adheres to the views there expressed. In entertaining the petitions in the accountings for the two common trust funds settled by decrees of this court it was necessarily held that jurisdiction to settle the account of a trustee of such a fund was vested in the court despite the fact that investments in it were made by fiduciaries other than testamentary trustees. The jurisdiction of the Surrogate's Court is exercised in matters *which involve living persons exclusively* whenever the court deals with adoptions, with guardians and with the private property of infants under its administration. In like manner the court deals with the rights of living persons and is authorized to adjudicate rights as between living persons not interested in an estate under section 206-a of Surrogate's Court Act (*Bradley* v. *Roe,* 282 N. Y. 525, 533–534). The court adjudicates

only the rights of living persons when it settles disputes as to validity of assignments on accountings. The highest judicial authority in this State has held that the court has the broadest power and the broadest jurisdiction in accounting proceedings (*Matter of Raymond* v. *Estate of Davis,* 248 N. Y. 67) whether rights of living persons not interested in the estate are involved or not.

When it exercised jurisdiction under subdivision 10 of section 100-c of Banking Law over an accounting by the trustee of a common trust fund this court necessarily held that it was not going outside the jurisdiction conferred on it by the Legislature under constitutional authority. That viewpoint will be adhered to despite the high respect which this court entertains for the writer of the opinion in *Matter of Security Trust Co. of Rochester* (189 Misc. 748) decided in Monroe County on April 30, 1947. Because the question of amortization is solely a matter of the internal administration of the common fund the objection which here seeks amortization of a premium paid by the common fund is overruled.

A further and final question relates to commissions payable in respect of the trust fund created under the quoted subdivision 10 of paragraph second of deceased's will. The trustee seeks to take income commissions now under subdivision 1A of section 285-a of the Surrogate's Court Act and to take annual principal commissions under subdivision 1B of the same section. If the trust created by deceased's will is " a testamentary trust in perpetuity " the trustee is limited to commissions on income only and at the rate of 5% of the income collected. The question is — What is a trust " in perpetuity "? In this material world nothing is perpetual or everlasting. As used in the Surrogate's Court Act the phrase is a phrase of discrimination and is intended to define such trusts as are not subject to limitation upon lives in being under what we call our Statute of Perpetuities. Since this trust still continues without date for its termination fixed by any human life span the trustee's commissions are limited to 5% on income. (Surrogate's Ct. Act, § 285-a, subd. 4.)

Submit, on notice, decree construing the will and settling the account accordingly.