Ellsworth N. Lawrence, S.
By the Stokes will, the residuary estate was bequeathed to the bank as trustee to pay income in quarterly installments to Mrs. Burke for life. Following her death the trust terminated, the remaining principal and accumulated income to be divided among designated remaindermen.
Mrs. Burke died December 23, 1957. Before and at the time of her death all of the corpus of the trust was invested by the *873 bank in 531 units of the first discretionary common trust fund of such bank, the bank being trustee of such common trust fund. According to the plan of operation of such fund, income from the fund, payable quarterly, was in fact paid to Mrs. Burke for the entire period ending with the last business day in October, 1957.
The next distribution of income from the 531 units was made as of the last business day in January, 1958 and was paid on February 4, 1958. It amounted to $781.90. It was paid to the remaindermen.
The parties have stipulated that Mrs. Burke’s executor, who had not been appointed until thereafter, has the right to intervene in the judicial settlement, to object to the account as reopened and to be heard thereon.
They have further stipulated that the amount claimed by Mrs. Burke’s'executor is 53/92 of the sum of $781.90, or the sum of $450.44. It is his claim that this sum should be apportioned to him as executor of the life beneficiary under section 204 of the Surrogate’s Court Act.
The question is whether this sum of $450.44 is income payable to the life beneficiary or whether it became a part of the remainder interest.
The question does not involve an interpretation of the language of the will. It does involve a question of when income accrues.
The common trust fund was established to enable the bank as a fiduciary to invest money held by it in a trust capacity for estates, infants, incompetents, etc. Ño part of the bank’s own funds were involved. The plan provided that no participating estate would have any ownership in any particular asset or investment of the fund.
The plan provided further for a valuation of the common trust fund and of the units thereof to be made quarterly to determine the principal value per unit and the income value per unit.
The income value per unit was to be determined by ascertaining the income held or accrued and remaining undistributed and by deducting therefrom all expenses and liabilities, due or accrued, which were chargeable to income; then dividing this result by the number of existing units.
The units could not be redeemed until the last business day of the appropriate month in each quarter.
The plan contemplated investments in common and preferred stocks, bonds, mortgages, notes and other evidences of indebtedness. Obviously the wide discretion given to the bank as trustee of the common trust fund in the making of investments and rein- *874 vestments would result in both long and short-term holdings of a great variety of securities, some more liquid than others. Some stock dividends would be received, perhaps to be classed as principal, perhaps as income. The times of payment of interest and of dividends would necessarily vary. The expenses of operation would vary too. There would be profits and losses from the sale and exchange of securities.
Because there was power to invest in common and preferred stocks, it was possible to expect a higher rate of return than would be the case where trust funds are invested only in legal securities.
As Surrogate Delehauty pointed out in Matter of Bank of New York (189 Misc. 459, 463) this concept of a new agency created for aggregating multiple interests requires a court to deal with such a fund as an entity separate from the trustee and separate from the individual estates whose moneys aré invested in participations in the fund.
Because the common trust fund must be treated as an entity, because the units could not be valued nor redeemed until the last business day in January, 1958, and because the total earnings of such units could not be determined until that time, it seems to this court that until they are so determined, there is nothing for the bank as trustee of the fund to pay over to itself as trustee under the Stokes will. There is something here analogous to the payment of a dividend by a corporation.
I therefore hold that no income accrued until the last business day of January, 1958. There was thus no accumulated income at the time of Mrs. Burke’s death. There is thus nothing to apportion. Section 204 of the Surrogate’s Court Act does not apply.
If it be argued that the bank could have made investments where the income would be apportioned to the date of death, the answer would seem to be that the bank, having wide discretion under the Stokes will, elected to make an investment with a probable higher rate of return and was required by its plan of operation to notify the beneficiaries of participation in the fund. The life beneficiary received more income so long as she lived to each quarter day. After that, her estate takes nothing. Submit decree.