Sebastiana DiMAURO

v.

George M. PAVIA et al.

Civ. No. H–74–79.

United States District Court,
D. Connecticut.

April 17, 1979.

Keith D. Dunnigan and Arnold J. Bai, Bai, Pollock & Dunnigan, Bridgeport, Conn., for plaintiff.

Bruce Louden, Thomas A. Rouse, Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NEWMAN, District Judge.

The plaintiff in this action seeks damages and equitable relief for alleged fraudulent and negligent acts by defendants in the administration of the estate of the plaintiff's late husband. Defendants have

moved on a variety of grounds for summary judgment on thirteen of fourteen counts in a second amended complaint (Complaint). They rely primarily, however, on two reasons set forth originally in their answer: that the plaintiff had an opportunity to present the basic claims in this case in a proceeding before the New York Surrogate's Court, and is barred by the decree in that Court from proceeding here; and that the plaintiff "directed, induced and consented" to the actions of defendants out of which the present case arises.

In the nine years since Orazio DiMauro died intestate in Italy, the dispute concerning the disposition of his estate has followed procedural paths leading to a suit of Dickensian complexity. The relevant facts can be derived from affidavits and the products of discovery had thus far,[1] as well as from previous court proceedings. The plaintiff Sebastiana DiMauro (DiMauro) is the sole heir of her husband Orazio, who died on January 25, 1970. The two had lived in Connecticut for several years before they returned to Italy in 1967. From his retirement in 1957 until his death, Orazio DiMauro's primary vocation was investing in the stock market. At his death, he owned securities in three corporations and a home in Siracusa, Italy; approximately 90% of the value of the estate was invested at that time in Harvey's Stores, Inc., a publicly traded corporation. On the date of death the shares of Harvey's Stores were worth approximately $840,000 (some 65,000 shares at nearly $13/share), and were held in a margin account with Francis I. duPont & Co. (duPont).

On December 30, 1969, Orazio DiMauro prepared a handwritten "Sworn Statement" setting forth his wishes for the disposition of his property. Among other provisions the statement included the instruction that the account at duPont "shall remain as it is intact. My stocks shall not be sold."[2] Because the statement was not a valid will, however, an intestacy resulted upon Orazio DiMauro's death. In May, 1970, a probate proceeding was begun in the Surrogate's Court of New York County,[3] and shortly thereafter that Court appointed defendant George Pavia as administrator of the estate. In this capacity, Pavia retained as counsel the law firm of Pavia & Harcourt (of which he and defendant Edgar Harcourt are senior partners). Attorney Ugo Gianformaggio was retained as local counsel in Siracusa, Italy, where plaintiff DiMauro resided.

A series of communications with Mrs. DiMauro during the next three years concerned the Harvey's Stores stock held by the estate. In her initial conference with Gianformaggio, in July, 1970, Gianformaggio asserts that DiMauro expressed a strong desire that her husband's securities be retained.[4] She executed a letter to Pavia to

1. The Court has before it a deposition of the plaintiff; plaintiff's answers to defendants' interrogatories, and defendants' answers to plaintiff's interrogatories and documents produced by requests; and affidavits, with attached exhibits, of four individuals: defendant George Pavia (administrator of the estate of Orazio DiMauro), defendant Edgar Harcourt (of the law firm of Pavia & Harcourt), Emanuele Turco (an attorney formerly associated with Pavia & Harcourt in Rome), and Ugo Gianformaggio (an attorney in Siracusa, Italy). Additionally, the defendants have submitted with their motion for summary judgment a statement of material facts as to which they claim there is no genuine issue to be tried. The plaintiff has not submitted a statement of material facts as to which there is a contention of a genuine issue to be tried, as required by Local Rule of Civil Procedure 9(d).

2. The statement further asserted that even if it failed to qualify as a valid will it should still "be sufficient to show all my intentions, and they should be applied to the letter." Plaintiff DiMauro acknowledges that her husband translated the statement into Italian for her, but she asserts that her husband said that he would sell the stocks he owned.

3. Orazio DiMauro's securities, the sole assets of the estate in the United States, were physically located in New York County. In addition, the securities were held in street name by duPont, which has its home office in New York City. Orazio DiMauro's last domicile was Connecticut. The real property that he owned was in Italy, and his testamentary statement had been written in Switzerland.

4. Gianformaggio wrote, in a letter dated July 27, 1970, to attorney Emanuele Turco at the

that effect. The letter had been prepared by Pavia, who had recently been nominated as administrator of the estate in New York; he had expressed his own opinion that the securities should not be sold at that time. Harcourt asserts that he told DiMauro by telephone on February 18, 1971, when Harvey's Stores stock was selling for approximately $26/share, that a prospective purchaser wanted the entire block of stock at a price between $20 and $22/share. DiMauro responded that she would not consider selling the stock for less than $30/share. A letter that Pavia wrote to DiMauro on the following day confirmed the information exchanged by phone. It further stated Pavia's conviction that the shares were not worth more than the $7 originally paid by Orazio DiMauro, and his doubts that the stock would remain at its current high price. Pavia specifically "decline[d] any and all responsibility in this regard [holding the stock until it reached 30]."

In September, 1971, DiMauro refused to sell a 90-day option for a call of the entire block of Harvey's Stores stock at 20, and in November she stated that she wanted any sale to be exempt from tax. In January, 1972, attorney Emanuele Turco of the Rome office of Pavia & Harcourt wrote DiMauro of the speculative nature of the Harvey's Stores stock, and enclosed a copy of an article from the New York Times reporting that the S.E.C. had filed a civil suit concerning insider-trading in Harvey's Stores. In September, 1972, in response to a margin call made by duPont when Harvey's Stores stock dropped below 4, DiMauro authorized the sale of the other two securities in the estate but not of any Harvey's Stores stock. DiMauro continued to oppose the sale of that stock after her return to the United States in August, 1973.

Throughout this period following the death of Orazio DiMauro, legal proceedings went forward in both New York and Connecticut. After the New York probate proceeding was opened in May, 1970, a probate

proceeding was also begun in the Probate Court of Bridgeport, Connecticut, in December, 1971, with Pavia again as administrator. A Connecticut succession tax return was filed in May, 1972. By order dated September 19, 1972, the Bridgeport Probate Court recited that the administrator had settled his account and that the entire amount remaining after payment of taxes, debts, fees and expenses should be distributed to Sebastiana DiMauro.

After DiMauro's return to this country in 1973, Harcourt wrote her in November of his opinion that all the stock in Harvey's Stores should be sold, and of his intent to sell at least enough of the stock to satisfy the remaining obligations of the estate, unless he heard from her to the contrary. DiMauro then retained counsel in Connecticut, who met with Harcourt in December. Pavia petitioned the New York Surrogate's Court for a final accounting and judicial settlement, and a citation to DiMauro was issued on January 10, 1974. The citation was for a proceeding scheduled for February 1, 1974, to settle Pavia's account as administrator, to fix and allow the fees of Pavia & Harcourt, and to authorize Pavia to sell as many of the shares of stock held in the estate as would be necessary to pay the balance of fees, commissions, costs and disbursements. The citation noted that failure to appear would be taken as consent to the proceedings, unless written objections were filed. At the February 1 proceeding, Harcourt appeared for Pavia, and DiMauro's Connecticut counsel was present but did not enter an appearance. Connecticut counsel was advised that he could, if he desired, retain New York counsel to enter an appearance, and was granted a two-week extension for this purpose.

According to plaintiff's answers to defendants' interrogatories, her Connecticut counsel decided that the more proper response was to file suit in Connecticut. The instant action was commenced in the Superior Court for Fairfield County by a com-

office of Pavia & Harcourt in Rome, that DiMauro "urgently recommends that the shares not be sold because of her strong desire to

leave them just as they were left by her deceased husband.">

plaint dated February 12, 1974. At the same time, DiMauro applied for and was granted an *ex parte* injunction that prohibited Pavia, Harcourt, and their law firm from "taking any further action in connection with the estate, including but not limited to any further proceedings in the Surrogate's Court for the County of New York." The suit in Superior Court was removed to this Court on diversity grounds by petition dated March 11, 1974.

In September, 1975, Pavia filed an affidavit of services with the New York Surrogate's Court, seeking commissions and fees. The Surrogate's Court filed a "Decree on Accounting" on October 6, 1975, on the basis of the petition, citation, and subsequent proceedings in that Court during January and February, 1974. The decree stated that the citation to DiMauro had been returned with proof of due service,[5] that Pavia had rendered his account to the Surrogate under oath on the return date of the citation, and that no objections had been made to the account. The decree set forth the administrator's commissions and costs and the legal fees that were being allowed; it authorized the sale of a sufficient number of shares held by the estate to satisfy the payments; it ordered Pavia to transfer to DiMauro all cash and securities remaining in his hands after the payments; and it ordered the account judicially settled. The distributions to DiMauro were completed by March, 1976.

DiMauro's general allegations in this suit are that the final account of Orazio DiMauro's estate was filed negligently with the Bridgeport Probate Court, in failing to exhibit the true nature of the estate (Count Twelve of the Complaint), that Pavia failed to administer the estate faithfully in accordance with his legal obligations (Count Thirteen), and that the firm of Pavia & Harcourt failed to advise the administrator of the estate with the care required of the legal profession (Count Fourteen). More specifically, DiMauro's Complaint asserts

that Pavia failed to make the distribution of estate assets ordered by the Probate Court (Count One), and that the affidavit of return stating that such distribution had been made was misleading and fraudulent (Count Two). The defendants are charged with having caused financial loss to the estate by their failure to pay the claims against the estate (in particular, the margin account at duPont) that the final account submitted to the Probate Court recited as having been paid (Count Three), to administer the estate in timely fashion (Count Four), to divest the Harvey's Stores stock within a reasonable time (Count Six), and to reinvest and diversify the estate's holdings to cause an appreciation in the value of the estate (Count Seven). The defendants were allegedly negligent in their attempt to administer the estate in New York (Count Five), and in their application to the Surrogate's Court for permission to sell sufficient shares held by the estate to cover fees and costs, in violation of the decree of the Probate Court (Count Eleven). Finally, negligence is charged in Pavia's submission for administrator's commissions ($15,000) and Pavia & Harcourt's submission for attorney's fees ($32,000) that are alleged to be unreasonably high (Counts Ten and Nine, respectively). For all of this, the Complaint seeks injunctive relief, an accounting, removal of Pavia as administrator, and damages of $1,000,000.

In deciding this motion for summary judgment, the Court has the benefit of a recent restatement by the Second Circuit of the law applicable to such motions. *S.E.C. v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978). The Rule governing summary judgment procedures, Fed. R.Civ.P. 56(e), provides that when a summary judgment motion is supported by depositions, affidavits, answers to interrogatories, and admissions, "an adverse party may not rest upon mere conclusory allegations or denials." *S.E.C. v. Research Automation*

---

**5.** In her application to the Superior Court for the *ex parte* injunction, DiMauro stated that she had "received notice that the defendants have applied to Surrogate's Court for the County of New York for permission to sell shares of stock belonging to the estate . . . .. Such proceedings . . . are scheduled for a hearing on Friday, February 15, 1974 . . . .."

*Corp., supra,* 585 F.2d at 33. The opposing party must support allegations made in the pleadings with particular facts and arguments. *Ibid.* In the light of the material provided, the Court can "recognize the realit[ies]" of the case before it, *id.* at 34, to the extent that no genuine issues of fact remain to be resolved. A party will not be allowed to create his own "genuine" issue of fact, however, simply by presenting internally contradictory statements (in affidavits and depositions, for example). *Perma Research & Development Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir. 1969). See also *Radobenko v. Automated Equipment Corp.,* 520 F.2d 540, 544 (9th Cir. 1975).

*Estoppel by Judgment*

■ As an initial objection, DiMauro claims that the instant motion must fail for what is essentially an alleged error of pleading. The doctrine of *res judicata* bars relitigation of a cause of action once judgment has entered; the judgment concludes claims that were actually made or might have been made. Collateral estoppel bars relitigation, in a subsequent suit brought on a different cause of action, of particular issues actually litigated and determined by the prior final judgment and essential to it. 1B Moore's Federal Practice, ¶ 0.405[1], at 621–23 (2d ed. 1974). Because the defendants have assertedly pleaded collateral estoppel on the basis of prior probate proceedings and because nothing was actually litigated in those proceedings, DiMauro argues that she is not barred from this action.

■■ It is true that a party relying on *res judicata* must plead that doctrine af-firmatively. *North Central Truck Lines, Inc. v. United States,* 381 F.Supp. 1217, 1220 (W.D.Mo.1974), aff'd, 420 U.S. 901, 95 S.Ct. 820, 42 L.Ed.2d 832 (1975). The purpose of the requirement is to ensure that a party against whom the doctrine is pleaded is adequately apprised that it is to be used. *Ibid.* (pleading of *res judicata* includes and gives notice of collateral estoppel defense); see also *Crowe v. Cherokee Wonderland, Inc.,* 379 F.2d 51 (4th Cir. 1967). The defendants' pleading in this case gave ample notice to DiMauro that they would rely on the judgments in probate proceedings as defenses to the instant suit. The second affirmative defense included with defendants' answer stated that "[t]he plaintiff had the full opportunity to raise the matters alleged in this action in the probate proceedings in Connecticut and New York . . . ." It noted that the New York action was not yet concluded, and that the opportunity to litigate still existed in the Surrogate's Court.[6] Thus, no surprise can be claimed by the application of either collateral estoppel or *res judicata.*[7]

■ The same reasoning defeats DiMauro's contention that summary judgment must be denied because it is based upon an affirmative defense filed in January, 1975, nine months before the Surrogate's Court decree on which the summary judgment motion relies. The affirmative defense, when asserted, noted that DiMauro could have brought and could still bring her objections before the Surrogate's Court. The proceedings in that court, naturally including the final decree that would end them,

---

6. The affirmative defense did not explicitly label the doctrine to be relied upon, though it did state that "the plaintiff is estopped from collaterally attacking" the prior probate judgment in later proceedings. Counsel for defendants noted at oral argument that as a technical matter they deemed the doctrine of *res judicata* unavailable where a party against whom the doctrine is pleaded in a later action was not a formal party in the earlier action producing the judgment relied upon. That interpretation of the law would virtually eliminate the use of *res judicata* on the basis of probate proceedings where parties in interest may not be formal parties to an adversary suit.

7. Recent decisions of the Supreme Court have shown that the major concern in deciding questions about collateral estoppel should be whether a party has had a full and fair opportunity to try identical issues that arise in serial proceedings. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (offensive use of collateral estoppel); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) (defensive use).

were relied on as a bar to the instant suit. Moreover, the motion for summary judgment not only referred to the affirmative defense, but also mentioned explicitly the decree of judicial settlement. A decree may be relied upon as *res judicata* although it is rendered after the initiation of proceedings in which the bar is then asserted. See *Princess Lida v. Thompson*, 305 U.S. 456, 59 S.Ct. 275, 83 L.Ed. 285 (1939).

Beyond the pleading issue, DiMauro asserts that the proceeding in the New York Surrogate's Court cannot bar the instant action because of the defendants' alleged negligence in undertaking the administration of her husband's estate there before opening the probate proceeding in Connecticut. The New York court's jurisdiction is said to have been defective, and its decree therefore not binding.

■ The surrogate's court of each county in New York is given jurisdiction by statute over the estate of any non-domiciliary of the state who leaves property within that county. N.Y.Surr.Ct.Proc. Act § 206 (McKinney 1967). A debt in favor of a non-domiciliary against a domiciliary is deemed personal property. *Id.* § 208. Since the securities constituting the only asset of Orazio DiMauro's estate in this country were physically located in New York County, see *id.* § 208(4), and since the holding of the securities in street name by duPont in New York City constituted a debt of the firm to Orazio DiMauro, the statutory requirements for the exercise of jurisdiction by the Surrogate's Court in New York County were met.

■ Defendants' actions in bringing the Surrogate's Court to exercise its jurisdiction were not negligent. To be sure, the Surrogate's Court has discretion in deciding whether to accept applications for original probate of estates of non-domiciliary decedents. See *Cornell v. Delehanty*, 173 Misc. 483, 18 N.Y.S.2d 153 (Sup.Ct.1940). And it may be proper to decline jurisdiction over an estate where no substantial tangible personalty of a decedent exists within the state and intangible property exists in the state of domicile. See *In re MacKean's Will*, 259 App.Div. 728, 18 N.Y.S.2d 230 (1940). But the exercise of jurisdiction has been held proper where a Connecticut decedent left personal property in New York, although she named as executor of her will a non-resident of New York. *In re Shailer's Estate*, 9 Misc.2d 62, 172 N.Y.S.2d 724 (Sur.Ct.1957). The interests of New York in Orazio DiMauro's estate are at least as strong. Especially where the Surrogate's Court in fact exercised its statutory jurisdiction, the defendants cannot be said to have been negligent for asking it to do so. The Connecticut Supreme Court has recognized the jurisdiction of the New York courts in an analogous case, where all assets of a trust were located in New York and the issue presented was the validity of the exercise of a power of appointment, in Connecticut, by a Connecticut domiciliary. *Morgan Guaranty Trust Co. v. Huntingdon*, 149 Conn. 331, 179 A.2d 604 (1962).[8]

■ DiMauro argues that even if the Surrogate's Court proceeding was properly undertaken, she cannot be bound by the final decree if she failed to receive notice and to appear. By her own admission and by recital of the decree of the Surrogate's Court, however, DiMauro did receive notice of the hearing scheduled for the purpose of closing the administrator's account. Her Connecticut counsel came to the court at

---

**8.** The denomination of probate proceedings in the state of domicile as "principal" and of those in the non-domiciliary state as "ancillary," see G. Wilhelm, *Connecticut Estates Practice: Settlement of Estates*, § 23, at 39 (1974), does not alter the fact that the proceedings of administration in different states of a single estate are independent of one another. *In re Patenotre's Estate*, 123 N.Y.S.2d 492 (Sur. Ct.1953). Normally the assets remaining after satisfying resident creditors of the state of ancillary administration are transmitted to the state of domicile, see G. Wilhelm, *supra*, § 60, at 78–79; but in New York it is within the discretion of the Surrogate's Court, in unusual circumstances, to direct distribution of the assets remaining after ancillary administration to the next of kin. *In re van Bokkelen's Estate*, 156 Misc. 439, 279 N.Y.S. 420 (Sur.Ct.1935). A case like this, where the "ancillary" proceedings are also the original probate of an estate, certainly justifies such a course.

the scheduled time, though he did not enter an appearance. The notice was constitutionally adequate to accord DiMauro an opportunity to appear and be heard in the orderly process of the determination of the interests of all claimants, resident and nonresident, in the estate of her husband. See *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950).

 Anyone on whom process must be served in accounting proceedings may file objections to them. *In re Woods' Estate*, 36 A.D.2d 880, 320 N.Y.S.2d 347 (1971). The failure to file objections in those proceedings forecloses later objection; any different rule would obliterate the benefits of judicial settlements of an accounting. *In re Weir's Will*, 182 Misc. 845, 46 N.Y.S.2d 551, 556 (Sur.Ct.1943). In this case, it was a strategic decision of counsel rather than lack of notice that resulted in DiMauro's failure to appear in a formal manner. Having declined the opportunity provided to file objections to the proposed accounting, she must be bound by the decree to the extent of one who does appear upon notice. *Hochster v. City Bank Farmers Trust Co.*, 260 App.Div. 712, 24 N.Y.S.2d 110 (1940), *aff'd*, 288 N.Y. 588, 42 N.E.2d 600 (1942).

 In both Connecticut and New York, the decree of a Court of Probate or a Surrogate's Court is conclusive as to all matters that it embraces. *Nikitiuk v. Pishtey*, 153 Conn. 545, 551, 219 A.2d 225 (1966); *Kochuk v. Labaha*, 126 Conn. 324, 329, 10 A.2d 755 (1940). See also *In re Williams' Estate*, 1 A.D.2d 1022, 151 N.Y.S.2d 561

(1956).[9] A final accounting, specifically, creates an estoppel with respect to items brought within the administration of the estate. *Kochuk v. Labaha, supra*, 126 Conn. at 329, 10 A.2d 755. The estoppel reaches only matters that are clearly and specifically set out, and are definitely ascertainable from a reading of the account and decree. *In re Williams' Estate, supra*, 151 N.Y.S.2d at 563; *In re Grace's Estate*, 62 Misc.2d 51, 308 N.Y.S.2d 33 (Sur.Ct.), *aff'd*, 35 A.D.2d 783, 315 N.Y.S.2d 816 (1970). Within that scope, however, the decree is conclusive both as to objections to the accounting that were actually raised and determined and as to matters that could have been raised. *In re Baker's Estate*, 249 A.D.2d 265, 292 N.Y.S. 122 (1936); *In re Blake's Will*, 46 N.Y.S.2d 549, 550 (Sur.Ct.1943). *Cf.* 3 A. Scott, *The Law of Trusts*, § 220, at 1765 (3d ed. 1967) [hereafter "Scott on Trusts"].

 The estoppel effect of prior decrees has usually been discussed in a context where those decrees emerged from a settlement or actual litigation involving all interested parties. See, *e. g., In re Schaefer*, 18 N.Y.2d 314, 274 N.Y.S.2d 869, 221 N.E.2d 538 (1966); *In re Jones' Will*, 13 Misc.2d 678, 177 N.Y.S.2d 307 (Sur.Ct.1958), *aff'd*, 8 A.D.2d 829, 190 N.Y.S.2d 166 (1959); *Grossman v. Kass*, 124 N.Y.S.2d 416 (Sup.Ct. 1953). The estoppel arises not because of the type of proceeding, however, but from the opportunity to raise objections. Once presented with that opportunity, a party must avail himself of it or be barred from raising it in later proceedings. The citation to DiMauro concerning the proceedings in

---

9. In this diversity case, state law is to be applied. In determining which state's law to apply, the Court follows the conflict-of-law rules of Connecticut. *Gibson v. Fullin*, 172 Conn. 407, 411, 374 A.2d 1061 (1977). Connecticut adheres to the usual rule that the law of the forum governs questions concerning remedies, as opposed to rights. *Morris Plan Industrial Bank v. Richards*, 131 Conn. 671, 673, 42 A.2d 147 (1945). Proper classification can be a difficult and somewhat metaphysical task, as for example when a statute of limitations is "so interwoven with the statute creating the cause of action as to become one of the congeries of elements necessary to establish the right . .." *Thomas Iron Co. v. Ensign-Bickford Co.*, 131

Conn. 665, 669, 42 A.2d 145 (1945) (limitations statute, in such a situation, is considered part of "right" rather than mere "remedy"). Though estoppel—both by judgment and *in pais*—presumably pertains to remedies, it is unnecessary to analyze this issue at length, because there is no inconsistency between the law of New York and Connecticut in these areas. Especially since the law of New York is considerably more fully developed than that of Connecticut, in ways that seem reasonably to indicate the analysis that Connecticut courts would adopt if confronted with the same questions, this Court will draw on the decisions of courts in both states to resolve the present dispute.

Surrogate's Court called attention to the proposed settlement of the administrator's account and to the proposed sale of sufficient shares of stock to cover expenses. This provided ample notice that matters would be determined as to which objections of negligence in investment management would be relevant. Failure to object establishes acquiescence in the accounting. See *In re Emmerich's Estate*, 175 Misc. 228, 23 N.Y.S.2d 42 (Sur.Ct.1940). *Cf. In re Baker's Estate, supra* ; *In re Blake's Will, supra.*

 The fact that individual securities were not actually listed in the citation does not constitute any defect in the notice. Had DiMauro chosen to come into court, she could have disputed the specific investments, in particular the retention of the Harvey's Stores stock. The accounting need not include overly minute details; an objecting party has some duty to make timely inquiry, once put fairly on notice. *In re Van Deusen's Will*, 24 Misc.2d 611, 196 N.Y.S.2d 737, 743 (Sur.Ct.1960). Having decided, upon notice, to forgo her chance to appear in the Surrogate's Court, DiMauro is bound by its decree.

 The scope of the decree includes administrator's commissions and attorney's fees. Especially when the administrator's commissions allowed by the Surrogate's Court were less than the amount permissible by statute, see N.Y.Surr.Ct.Proc. Act § 2307 (McKinney 1967 and Supp.1978), there is no reason to reopen the decree in this regard. See *In re Rosenthal's Estate*, 141 Misc. 404, 252 N.Y.S. 596 (Sur.Ct.1931). The Surrogate similarly acted well within his discretion in allowing attorney's fees in the amount sought. See *Krimsky v. Lombardi*, 78 Misc.2d 685, 357 N.Y.S.2d 671 (Sup.Ct.1974), *aff'd*, 51 A.D.2d 600, 377 N.Y.S.2d 785 (1976); *In re Baker's Estate, supra.* These principles conclude DiMauro's claims concerning commissions and fees, quite aside from the argument that she is equitably estopped to make these claims by her signing on April 18, 1972, a letter agreeing to commissions and fees in the amounts awarded.

 Formally, the Surrogate's Court proceeding is *in rem*. *In re Kramsky*, 172 Misc. 935, 16 N.Y.S.2d 185 (Sur.Ct.1939). But labels are not dispositive of the issues in this case. *Cf. Mullane v. Central Hanover Bank & Trust Co., supra*, 339 U.S. at 312, 70 S.Ct. at 656. A judicial proceeding to settle fiduciary accounts settles every right that a beneficiary would otherwise have against the fiduciary for improper management of funds held during the period of the accounting. *Id.* at 311, 70 S.Ct. at 655; *cf. In re Hoagland's Estate*, 194 Misc. 803, 74 N.Y.S.2d 156 (Sur.Ct.), *aff'd*, 272 A.D. 1040, 74 N.Y.S.2d 911 (1947), *aff'd*, 297 N.Y. 920, 79 N.E.2d 746 (1948). This is not inconsistent with the rule that a proceeding *in rem* to determine interests in property is conclusive upon persons named as defendants with respect to interests in the property only. *Sherman v. Kirshman*, 369 F.2d 886 (2d Cir. 1966). A probate proceeding for a final accounting names no one as defendant, but adequate notice brings interested parties to court, nonetheless. And its results should be conclusive to the same degree as those of the decree settling the trustee's accounts in *Mullane.*

 The jurisdiction of the probate court is not based on and limited to attachment of specific property when a party is not present to confer personal jurisdiction on the court. *Cf. East Asiatic Co. v. Indomar, Ltd.*, 422 F.Supp. 1335 (S.D.N.Y.1976). Rather, the probate court in this case had before it the entire assets of the estate in this country and the fiduciary in charge of their disposition. Its jurisdiction is in the nature of *in rem* or *quasi in rem* to the extent that it determines the interests of beneficiaries in the property in question, and in the nature of *in personam* as to the claims of the beneficiaries against the administrator arising out of the administration of the funds. *Cf.* 5 Scott of Trusts, *supra*, § 568, at 3809. This is so even though the beneficiaries are not resident and are not personally subject to the court's jurisdiction as to claims against them. *Ibid.* This principle was articulated in *Mullane* in the context of the administration of a com-

mon trust fund. Extending it to trusts and fiduciary relationships in probate settings in general is justified by the same pervasive state interests in administering in an orderly fashion trusts and estates created under the auspices of its laws, and in making the administration proceedings conclusive to ensure stability for the funds administered and for the administrators.

DiMauro could have litigated in the Surrogate's Court proceeding the issues she raises in this suit other than those involved in the five counts that concern particularly the proceedings in the Connecticut Probate Court.[10] With those exceptions, DiMauro's entire suit raises questions of management of estate assets by the administrator, and of legal advice by the law firm retained as counsel in the administration process in New York. A similar situation was presented in *Krimsky v. Lombardi, supra,* where a final settlement entered by the Surrogate's Court was held to preclude a later malpractice suit by executors against the law firm they had retained. The final decree dealt expressly with such matters as estate taxes, guardians' allowances, and attorney's fees, and therefore barred the malpractice allegation of overpayment of estate taxes. The count alleging loss of estate assets from negligence (specifically, alleged incorrect advice concerning the executors' power to continue the high risk business owned by the decedent) was also barred because such matters about corporate transactions were necessarily comprehended in the express provisions of the decree.[11] The same bar operates here.

The bar is recognized in courts of other jurisdictions. Connecticut courts give full faith and credit to judgments of the Surrogate's Court in New York, at least in circumstances where decision has been rendered after a hearing at which both plaintiff and defendant appeared. *Rathkopf v. Pearson,* 148 Conn. 260, 170 A.2d 135 (1961). There would be no justification to deny full faith and credit to the judgment because a party with notice of the proceedings chose to stay away from them. To the contrary, any rule denying full faith and credit to a judgment in that situation would frustrate the constitutional full faith and credit provision, by encouraging interested parties with notice to avoid any proceeding in which they doubted their chances of success. Thus, adequate notice permits a probate court to adjudicate a person's claims in the estate and against the administrator. The judgment rendered is entitled to full faith and credit in the courts of another state even though the person with notice failed to appear. *Blum v. Probate Court of Chittenden County, Vermont,* 575 F.2d 50 (2d Cir. 1978), *vacated on other grounds,*

---

**10.** Counts One and Two concern Pavia's alleged failure to distribute the estate assets as ordered by the Probate Court in Connecticut, and the allegedly misleading and fraudulent affidavit of return stating that the distribution had been made. Count Three charges that the defendants caused a loss to the estate by a failure to pay claims against the estate that the final account to the Probate Court asserted had been paid (specifically, the margin account at duPont). Count Eight alleges negligence in the failure to apply to the Probate Court for a widow's allowance. Count Twelve alleges that the final account filed in the Probate Court failed to exhibit the true nature of the estate.

**11.** The fact that the Surrogate's Court in *Krimsky* entered its decree after a hearing, trial, and subsequent written agreement of settlement, does not distinguish that case in a way that lessens its applicability here. DiMauro had notice sufficient to allow her to make objections in the Surrogate's Court and to pursue litigation like that held in *Krimsky.*

Ordinarily, the acceptance of an administrator's or executor's final account concludes issues about the legality and propriety of investments made by the trustee. *State ex rel. Beardsley v. London & Lancashire Indemnity Co.,* 124 Conn. 416, 422–23, 200 A. 567 (1938). Only in an unusual case, where for example an executor files an account showing property held by the decedent as trustee under the will of a previous decedent, is the Probate Court's acceptance of the account more limited. *Id.* at 423–24, 200 A. 567. In the latter situation, the decedent trustee is only a conduit of the property of the first decedent, and the executor of the decedent trustee files a statement of the property found by him without regard to the character of the investments. The Probate Court is not called upon to find anything more than that the executor filed an accurate statement of what he found.

590 F.2d 407 (2d Cir. 1979). See also 3 Scott on Trusts, *supra*, § 220, at 1768. By this rule, the decree of the Surrogate's Court concerning the estate of Orazio DiMauro must receive full faith and credit in the courts of Connecticut.

DiMauro claims that fraud in the procurement of the Surrogate's Court decree strips it of all effect as a bar to this suit. On or about February 12, 1974, the Superior Court for Fairfield County entered an order, upon DiMauro's application, enjoining the defendants from taking any further action in connection with her husband's estate, including the proceeding scheduled for February 15, 1974, in the Surrogate's Court. None of the defendants received prior notice of the application; none appeared before the injunction issued. In September, 1975, Pavia filed with the Surrogate's Court an affidavit of services, and the Surrogate's Court issued its final decree during the following month. DiMauro asserts that the affidavit of services was submitted in violation of the *ex parte* injunction, and that any decree relying on the affidavit was fraudulently induced.

■ A decree of a probate court may be set aside for reasons of fraud. *In re Van Deusen's Will, supra*, 196 N.Y.S.2d at 740; *Folwell v. Howell*, 117 Conn. 565, 569, 169 A. 199 (1933). See also Conn.Gen.Stat. § 45–9 (allowing collateral attack on a probate court decree only for fraud); 3 Scott on Trusts, *supra*, § 220, at 1766, and § 260, at 2218. But the decree of the Surrogate's Court was not obtained in violation of an outstanding injunction, and was therefore not fraudulently induced. Although a "temporary restraining order" (TRO) does not exist in those terms in Connecticut practice, a temporary injunction granted

without prior notice and hearing, see Conn. Gen.Stat. §§ 52–471, 52–473, is equivalent to the federal order governed by Rule 65(b), Fed.R.Civ.P. See 2 E. Stephenson, *Connecticut Civil Procedure* § 268b, at 1109 (2d ed. 1970); *cf. Morning Telegraph v. Powers*, 450 F.2d 97, 99 (2d Cir. 1971) (drawing distinction between TRO and preliminary injunction). Such a temporary order should continue only for the time required to notice and hold a hearing. See Conn.Gen. Stat. §§ 52–473, 52–475; 2 E. Stephenson, *supra*, § 268b, at 1109.

Upon removal of this case from the state court system, the order of the Superior Court remained in effect. 28 U.S.C. § 1450. But the removal did not transform the order of limited duration into a federal court injunction of unlimited duration. Rather, the *ex parte* TRO issued by the state court prior to removal remained in force no longer than the time limitations imposed by Rule 65(b). *Granny Goose Foods, Inc. v. Teamsters Local 70*, 415 U.S. 423, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974). According to these limitations, the order "died a natural death," see *id.* at 440, 94 S.Ct. at 1124, before April, 1974.[12]

Rule 65(b) places on the party obtaining the TRO the burden of applying for and presenting its case to justify a preliminary injunction. DiMauro did not seek the hearing required for injunctive relief beyond the TRO, and the defendants did not consent to an indefinite extension of the TRO. *Cf. New York Telephone Co. v. Communications Workers of America*, 445 F.2d 39 (2d Cir. 1971). The defendants in fact filed on May 16, 1975, a motion to confirm the expiration of the temporary order.[13]

■ The defendants moreover assert that DiMauro forced them to return to the

---

12. *But cf. Standard Forms Co. v. Nave*, 422 F.Supp. 619 (E.D.Tenn.1976). In *Standard Forms* the state court, before the case was removed, had granted the plaintiff an order restraining the defendant from violating a covenant not to compete. According to Tennessee law, a restraining order granted without notice remains in force until otherwise ordered by the court, unless the order itself provides an earlier termination date. The Court held that in this situation the order was not a "temporary" restraining order and therefore did not come within the rule of *Granny Goose*. 422 F.Supp. at 622. That rationale would also distinguish *Standard Forms* from the instant suit, since the order of the Connecticut Superior Court was tantamount to a TRO.

13. The motion was marked off the calendar, without prejudice, on March 25, 1976.

Surrogate's Court, by moving in this Court on May 20, 1975, that defendants be compelled to convey to her the balance of the estate. After this Court granted DiMauro's motion and ordered a transfer to her of all but $47,000 (the amount allowed by the Connecticut Probate Court and sought from the New York Surrogate's Court for administrator's commissions and legal fees), Pavia filed for a final accounting to close the Surrogate's Court proceedings. Whether or not he was required to do so, the petition to the court where administration of the estate had been first and properly undertaken was consistent with the decree of this Court.[14] Compare *Adams v. Williamson*, 150 Conn. 105, 186 A.2d 157 (1962) (executrix denied *res judicata* benefits of probate court decree based on her previous accounts that yielded admittedly excessive payments to her). The actions of the administrator reflect due deference to the courts involved rather than contempt and deception. The estoppel effect of the Surrogate's Court decree is not impaired by any fraud. The estoppel extends to Counts Four, Five, Six, Seven, Nine, Ten, Eleven, Thirteen, and Fourteen.

■ The same principles of estoppel by judgment apply to the proceedings in the Connecticut Probate Court. The decree of final accounting in that Court recites that it issued upon due notice and hearing, see Conn.Gen.Stat. § 45–267, and DiMauro has not made any claim to the contrary. The concluding proceedings offered an opportunity to object to Pavia's final account. Specifically, questions could have been raised about negligence for an alleged failure to exhibit the true nature of the estate in the final account and accompanying inventory. Because they were not raised, they are now barred by the decree, and Count Twelve of the Complaint, which presses these claims, is therefore dismissed. Specific complaints about the failure to pay off the margin account at duPont and other debts of the estate could also have been made. The Probate Court decree thus disposes of Count Three, also.

*Estoppel in Pais*

Central to DiMauro's Complaint is the claim that the defendants retained the stock in Harvey's Stores when they should not have. In this motion defendants make the argument, independent of that concerning estoppel by judgment, that DiMauro "expressly directed, induced, acquiesced in and consented to" the actions of defendants about which she complains. The defendants do not dispute that prudent investment would have involved early sale of this speculative stock, which comprised the bulk of the estate. Rather, they contend that the stock was retained because of DiMauro's actions and that she is thereby equitably estopped to base claims upon the retention.

■ When one party does or says something upon which he intends another to rely and act, and that second party does so rely and change his position to his detriment, the conduct of the first party estops him to complain about the action taken. See *Mercanti v. Persson*, 160 Conn. 468, 477, 280 A.2d 137 (1971); *Lynn v. Lynn*, 302 N.Y. 193, 97 N.E.2d 748 (1951). Although an administrator must in normal circumstances sell stock owned by a decedent within a reasonable time and at the best price obtainable by reasonable diligence, *Stark v. National City Bank*, 278 N.Y. 388, 16 N.E.2d 376 (1938), encouragement or acquiescence by a beneficiary in the retention of securities that eventually lose value prevents the beneficiary from bringing legal action for the loss. *In re Garvin's Will*, 256 N.Y. 518, 177 N.E. 24 (1931). By explicit holding in Connecticut, where an administrator, acting in good faith and with ordinary care for the good of the beneficiaries,

14. The petition to the Surrogate's Court was also consistent with the decree of the Connecticut Probate Court. See page 1057, *supra*. The Surrogate's Court was aware of the previous proceedings in Connecticut. Pavia applied to the Surrogate's Court on January 3, 1972, to terminate the continuation of his bond in that Court, in light of the bond filed in connection with the proceedings in Connecticut. The final account submitted to the Surrogate's Court also mentioned and described the Connecticut proceedings.

deviates with their consent from the strict line of his duty and loss results, the consenting beneficiaries cannot charge him with the loss. *Mathews v. Sheehan,* 76 Conn. 654, 662, 57 A. 694 (1904).

The rule has been applied to situations resembling the one presented here, where stock held by a decedent at the time of his death was held after his death by executors or administrators, with the approval of beneficiaries. See *In re Garvin's Will, supra; In re Weston,* 91 N.Y. 502 (1883). The beneficiaries in *In re Kent's Estate,* 146 Misc. 155, 261 N.Y.S. 698 (Sur.Ct.1932), *aff'd,* 246 App.Div. 604, 284 N.Y.S. 976 (1935), directed that stock be retained with the expectation that they would take it over in kind at the completion of administration of the estate. Their directions barred any complaint, when the stock declined in value. *Id.* at 261 N.Y.S. at 704–05.

■■■■ DiMauro instructed Pavia to retain the securities in her husband's estate. The letter that she signed to Pavia in July, 1970, had been prepared by Pavia's law office and · reflected his own opinion that the stock should not then be sold (see letter to Gianformaggio of June 23, 1970). But there is no evidence to support a claim that Pavia was not acting in good faith and with proper care. Having only been nominated as administrator in New York, Pavia would reasonably have wanted time to review the estate's holdings before acting. The Harvey's Stores stock, which at the time of Orazio DiMaruro's death was selling at nearly 13, dropped thereafter and reached 7 by the end of the year. There is no allegation that Pavia sought any personal financial gain by advising that the securities be retained at the time of his appointment.

By the beginning of 1971, correspondence between Pavia and DiMauro shows clearly that Pavia urged DiMauro strongly to sell the Harvey's Stores stock at that time. From a market value of approximately 7 on January 25, 1971, the stock rose steadily and quickly to approximately 26 on February 18, 1971. That DiMauro carefully considered the matter of retaining the stock is shown by her insistence that it not be sold for less than 30.[15] She remained aware of the movements of the stock and the possibilities of selling it. In her letter of November 12, 1971, to her attorneys she noted that Turco had talked with her about selling the stock at 20; she wanted particularly

---

**15.** Harcourt's notes of a telephone conversation with DiMauro on February 18, 1971, state that she wanted to hold the Harvey's Stores shares, and that she wanted to realize $30/share in a market she felt was going up. Pavia wrote a letter to her on the following day, confirming his understanding of her instructions. At her deposition, DiMauro did not remember the letter. Earlier in the deposition, she did recall the February, 1971, telephone conversation, where she discussed selling 5,000 shares of Harvey's Stores stock and said that her husband "told me that it should go up to 30."

After the telephone conversation and Pavia's letter of February 18, 1971, DiMauro signed a letter dated February 21, 1971, authorizing sale of securities sufficient to pay federal and state taxes and "to cancel the amount of the margin debit in the [duPont] account." This letter, mentioned by neither side in this suit at any time, has apparently been taken by no one to mean that the margin account should have been closed by sale of stock on conditions other than those mentioned repeatedly by DiMauro.

The instructions given by DiMauro concerning the sale of stock either barred the sale outright, imposed impossible conditions, or op-

erated in contradictory directions. Some correspondence indicates clearly that DiMauro did not want the Harvey's Stores stock sold. At her deposition, in response to a question asking whether she had requested or directed Pavia and Harcourt not to sell the stock at any time between 1970 and 1973, DiMauro answered, "I never said this word to them." Her testimony clouds some issues, but does not create a genuine issue of material fact. Cf. *Perma Research & Development Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir. 1969). The fact remains that she did not want the stock sold. The administrator's and lawyers' efforts to understand her instructions, when they became as confusing as her later deposition, show only diligence and care.

The Court takes note of the fact that translations of documents originally written in Italian differ in some respects. DiMauro has objected that translations she has submitted through her counsel differ in significant ways from those submitted by the defendants. But a careful inspection of alternative translations of all relevant documents reveals no difference so significant, either in specific words and phrases or in the tone and emphasis of an entire document, as to raise a genuine issue of material fact.

to know whether any sale would be tax exempt. A letter to Pavia on November 26, 1971, asserted that "I wish that the sale of the block of Harvey's Stores be exempt from Income Tax." The prices she wanted for the sale of stock may have been unrealistically high at the times they were mentioned,[16] cf. *In re Pinney's Estate*, 250 App. Div. 60, 294 N.Y.S. 29 (1937), aff'd, 278 N.Y. 507, 15 N.E.2d 669 (1938), but the estoppel here arises from the fact that DiMauro was taking such an active and detailed interest in the movements of the stock, not that she was an inaccurate market analyst.

 If DiMauro's conduct is not held to give rise to an estoppel, legal liability might be asserted for a *failure* to follow instructions to retain securities, in the event stock had been sold and then rose in price. *Cf. In re Weston, supra*, 91 N.Y. at 511. An administrator or executor is entitled to expect stability in his role as fiduciary, which calls for him at once to act disinterestedly in the best interests of the estate and the beneficiaries, and also to heed the directions of a sole beneficiary. Even communications that are not express directions will bind a beneficiary, if the fiduciary could reasonably interpret them as authorizing and consenting to the actions that he then takes in reliance on them. See *In re Pinney's Estate, supra*, 294 N.Y.S. at 38. The fact that a beneficiary consents to actions that would normally be illegal for a fiduciary estops the beneficiary to complain, although a probate court could not itself authorize or condone the actions. See *In re Packard's Estate*, 146 Misc. 65, 261 N.Y.S. 580 (Sur.Ct. 1932) (remaindermen of trust are estopped by their previous consent to assert illegality of investments of trustee that were against terms of the trust).

The communications between DiMauro and the defendants show clearly that she wished the stock in Harvey's Stores not be sold, except at prices that were unrealistic. Her unmistakable intentions obviously put

Pavia in a difficult position. His appreciation of this bind is reflected in the February 19, 1971, letter to DiMauro, in which he urged her to accept the then-pending offer for her Harvey's Stores shares (at 20), asserted that he was "absolutely convinced" that the shares were not worth more than the $7 originally paid for them, and declined responsibility for any future drop in price. That he did not decline responsibility as fiduciary in general is clear from his subsequent continued efforts to negotiate a sale of the stock as the price did in fact drop, and his frequent communications with DiMauro about the securities still held in the estate. Defendants showed no bad faith in their dealings with DiMauro. Any stock that Pavia did sell was for the purpose of paying estate taxes and meeting other expenses of administration.

DiMauro asserts that she could not have given her own instructions to hold the stock or to seek a certain price or to sell under specified conditions, because she lacks the education necessary to understand the transactions involved. The corollary of these assertions is that she automatically followed her lawyers' advice and signed whatever documents they put in front of her.

Her own deposition, despite internal inconsistencies, contradicts this position. She discussed margin accounts and selling stock "to cover the margins" (after asserting earlier that she did not know what a margin account was). When a sale of stock was required by a margin call in September, 1972, she wrote to Pavia to be cautious in the sale of her 11% of the company "because I do not wish to depress the stock . . . ." She had discussed earlier the sale of a "block" of the Harvey's Stores stock, and was concerned about the tax treatment of the sale (she wanted a tax free sale). She knew that "after six months income taxes are paid . . .

---

**16.** The market price at the relevant times was approximately 26 and 16, respectively. When the offer of an option (at $1/share) was made for a call of the entire block of stock at 20, DiMauro evidently lowered her sights from $30/share to the range of $26–28/share. See cable of September 17, 1971, from Turco to Pavia & Harcourt, and letter of September 21, 1971, from Turco to Harcourt.

only on half the net earnings or net income." She understood that confirmation slips are sent to customers after stock transactions, and used the slips to prepare detailed schedules for income tax purposes. Her failure to continue formal schooling beyond the fifth grade obviously did not prevent her from developing considerable sophistication concerning investments. DiMauro was fully capable of giving directions about investments to Pavia, and Pavia was reasonable in the way he understood her considered opinions and in acting in accordance with the instructions and indications he received from her.

■ DiMauro is equally estopped to take issue with the administrator's commissions and attorney's fees in connection with the estate administration. Aside from the estoppel by judgment of both the Connecticut and New York courts (which allowed the identical amounts, since no additional fees and commissions were sought by virtue of the second proceeding), an estoppel arises from the agreement that DiMauro signed on April 18, 1972. That letter approved proposed payments of $60,000 for attorney's fees and $15,000 for administrator's commissions. The letter was prepared by the offices of Pavia & Harcourt. DiMauro has represented that she signed the letter on the assumption that the administrator and attorneys had exercised reasonable diligence and shown reasonable care in handling the estate. This Court finds no indication that the defendants acted otherwise. DiMauro is bound by the letter she executed upon that assumption and with the knowledge, through correspondence a few months earlier about the tax consequences of a sale of stock, that the Harvey's Stores shares had already dropped as low as 12 (see letter from Pavia to DiMauro dated December 13, 1971).

■ Despite the factual foundation for an estoppel, DiMauro presses the equitable defense of unclean hands to prevent the application of this doctrine of equity. The principle of unclean hands is usually applied only to prevent affirmative relief, because of some fraud or deceit relating to the matter in issue. See *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *cf. McGrath v. Hilding*, 41 N.Y.2d 625, 394 N.Y.S.2d 603, 363 N.E.2d 328 (1977). The fraud on which DiMauro bases her defense is the defendants' alleged violation of the injunction against proceeding with the administration of the estate of Orazio DiMauro. It is not clear that such a fraud would pertain to the retention of securities at the behest of the beneficiary here. But the issue need not be resolved, since it has already been decided that the defendants did not act fraudulently in closing the estate in the Surrogate's Court.

DiMauro is therefore estopped to pursue the claims presented in Counts Three, Six, Seven, Nine, and Ten. The estoppel also extends to any claims included in Counts Thirteen and Fourteen that Pavia failed to act faithfully as administrator, and that Pavia & Harcourt failed to advise the administrator with proper care, by virtue of the retention of Harvey's Stores stock.

*Mootness and Failure to State a Claim*

■ The defendants have moved for summary judgment on Counts One, Two, and Eleven, asserting that the claims presented there have become moot since this action was begun. Count One complains of Pavia's failure to distribute to DiMauro the assets of the estate remaining after satisfying claims and expenses, pursuant to the order of the Bridgeport Probate Court. Since those assets have in fact been distributed, albeit after considerable dispute between the parties and after further order of this Court on June 12, 1975, the claims presented in Count One have become moot. The fact that the sum of $47,000 was withheld from distribution, as allowed in the latter order, does not alter this result. The final account to the Probate Court included the $47,000 in administrator's commissions and lawyer's fees as claims against the estate. Thus, the net amount available for distribution to DiMauro never included that disputed sum.

It should be noted that the amount of money available for distribution, even at the date on which the Probate Court entered its order of distribution, was substantially less than the amount listed by that Court. The order, and the administrator's accounting and succession tax return on which it was based, assumed an asset valuation as of the death of Orazio DiMauro. At the time of his death, Harvey's Stores stock had a market value of nearly 13. At the time the Probate Court entered its order, the market value had fallen below 4. Since the stock in that one company comprised the bulk of the estate, the value of the entire estate had decreased significantly by September 19, 1972.

The retention of the stock had been brought to the attention of the Probate Court in explicit terms in the Connecticut succession tax return (since the original is filed with that Court). The assets, claims, and expenses listed in the final account were identical to those in the tax return, with the sole addition of the amount of tax computed as owing in Connecticut. "The mere fact that the account shows property on hand for distribution at a certain dollar figure does not establish a monetary liability on the fiduciary to the distributees in that amount." G. Wilhelm, *Connecticut Estates Practice: Settlement of Estates*, § 319, at 448 (1974) (hereafter *"Estates Practice"*). The decree settling the account establishes that the fiduciary has the items listed in his accounting, not that they carry the same value. *Ibid.* See also *Sellew's Appeal*, 36 Conn. 186, 193 (1869); *cf. Sachs v. Feinn*, 121 Conn. 77, 82, 183 A. 384 (1936). Thus, in listing the amount available for final distribution, the Probate Court would have understood in this case that the property still held in kind might have a value greater or less than the dollar amount listed.

"Distribution" in this context does not mean disbursement to beneficiaries. It has the specialized meaning of apportionment among beneficiaries. Rather than transferring assets, distribution simply converts the common ownership of all distributees in all estate assets into separate equitable ownership of specific assets. *Estates Practice, supra,* § 325, at 459–60, and § 348, at 493; see also *Mack's Appeal*, 71 Conn. 122, 128–29, 41 A. 242 (1898); *Kingsbury v. Scovill*, 26 Conn. 349, 352–53 (1857). In DiMauro's situation as the sole beneficiary, the Probate Court order of distribution, dated September 19, 1972, could be quickly carried out as a formal matter. The return required by that order and by statute, Conn.Gen.Stat. § 45–19, was duly made by Pavia. For these reasons, Count Two of the Complaint, which asserts that Pavia's affidavit of return was misleading and fraudulent in saying that distribution had been made, lacks merit.

Count Two also lacks merit insofar as it complains of a failure to disburse the property distributed to DiMauro. This count relies on the assertion in the signed affidavit "that all moneys and property . . . have been paid over and distributed to the persons entitled thereto according to law . . . and the orders of said [Probate] Court, and that so far as the fiduciary has any knowledge said estate is now fully administered and settled." As explained above, property had been distributed as ordered by the Probate Court. No statutory provision exists in Connecticut for a return by a fiduciary showing that he has delivered and transferred assets in accordance with the order of distribution and return of distribution. See *Merwin's Appeal*, 75 Conn. 33, 36, 52 A. 484 (1902); *Estates Practice, supra,* § 350, at 496. But the probate court may require a return of final settlement, to show actual disbursement. *Ibid.*; *cf. Morse v. Ward*, 92 Conn. 286, 292, 102 A. 586 (1917). To disburse the property in this case, however, Pavia needed the additional authorization of the Surrogate's Court in New York, which also had jurisdiction over the estate.

Connecticut statutes do not deal with this situation, but the leading practice book recognizes the gap between Connecticut law and that of states like New York, which allow original probate proceedings of non-domiciliaries' estates if property is located

within their jurisdiction. G. Wilhelm, *Connecticut Estates Practice: Death Taxes* § 66, at 160 (1974). Since the administrator in New York would be liable for succession taxes in Connecticut in a case such as this, *ibid.*, he must realistically come into Probate Court in Connecticut. But he cannot in doing so ignore the Surrogate's Court. In this unusual situation, distribution according to the order of the Connecticut Probate Court would mean apportionment of the proper share of the estate to each beneficiary, and then disbursement in those proportions after approval by the Surrogate's Court. This is precisely the course that Pavia followed, and his return to the Probate Court is taken to signify such action.

Count Eleven has already been dismissed for reasons of estoppel by judgment. Moreover, it rests on similar allegations to those involved in Count Two, specifically that Pavia and Pavia & Harcourt were negligent in applying to Surrogate's Court for permission to sell shares of stock to pay commissions, fees, and costs in violation of the Probate Court order of distribution. These claims have no merit for the reasons stated previously. The request made to the Surrogate's Court for fees and commissions did not exceed that allowed by the Probate Court. Thus, the Surrogate's Court allowance to sell shares to cover fees, and commissions did not diminish the estate in any greater degree than anticipated by the final order of the Probate Court.

■ The defendants have moved for summary judgment on Count Twelve for failure to state a claim upon which relief can be granted. Already dismissed for reasons of collateral estoppel, any claims stated in this count also fail on the merits. The final account and inventory in the Connecticut Probate Court, alleged to lack particularity and to exhibit the true condition of the estate, are sufficiently precise to fulfill the purpose of the account. They give interested parties full information regarding the contents of the estate, and establish the property to be distributed, valued at a particular date. See *Marks' Appeal*, 116 Conn.

58, 163 A. 600 (1932); *Estates Practice*, supra, § 287, at 408–09. Accounts that must be submitted periodically by fiduciaries need not include updated inventories if there has been no change in the identity of the items in the estate since the last account accepted and approved. Conn.Gen. Stat. § 45–268. Final accounts should be governed by the same principles.

■ Count Eight, not specifically referred to in the motion for summary judgment, presents a claim of negligence arising out of the failure to apply for a widow's allowance for DiMauro in the Connecticut probate proceeding. This matter could have been raised before the closing of the estate in Connecticut, and is therefore barred by the final decree there from consideration in this case. Even if it could be adjudicated here, the count fails to state a claim upon which relief can be granted. The allowance is discretionary with the Probate Court, Conn.Gen.Stat. §§ 45–250, 45–273a, and is to be given only if judged necessary for the support of the surviving spouse. *Ibid.* Though "necessity" is broad enough to include more than maintenance of the survivor at a mere subsistence level during the administration of the estate, see *Baldwin v. Tradesmens National Bank*, 147 Conn. 656, 165 A.2d 331 (1960), there is no indication that an allowance is justified for the sole purpose of reducing the value of the estate in order to reduce in turn the estate taxes owing. Count Eight is based on exactly those grounds of decreasing taxes. No allegation is made that DiMauro required an allowance for her support.

In light of the decisions above, it is unnecessary to decide the motion to dismiss the law firm of Pavia & Harcourt as a defendant, for reasons of lack of personal jurisdiction.

*Conclusion*

. The motion for summary judgment is granted. Since the decision disposes of all counts of the Complaint, judgment may enter for the defendants.