John D. Bennett, S.
In this contested accounting proceeding, two of the executors, Joseph P. Grace, Jr., and Charles Macdonald Grace, have filed their final account for the period December 31, 1959 to December 31, 1963 and brought such account down to October 25, 1968 by affidavits. Their brother, Michael P. Grace II, a coexecutor, has filed numerous objections.
Although there was a prior intermediate accounting, this final account follows the decedent’s death on July 15, 1950 by more than 19 years. The protracted litigation which has developed between the two accounting executors and their co executor has affected the rights and interests of their sister, a judicially declared incompetent, charities, and a number of infants represented by a guardian ad litem. Because of the somewhat peculiar nature of the estate and the manner in which it has developed, some general observations amply supported by the record are in order prior to a determination of the objections.
The two accounting executors, it would seem, have obviously hoped that by ignoring their brother his objections to their method of handling the estate would disappear. History has proved them wrong. Their actions demonstrate they never fully comprehended or conceded that the objecting executor was entitled to the same rights and privileges afforded them. The antagonisms that have ensued as a result of the accounting executors locking out the objecting executor from much of the intricate matters dealing with this estate have been a catalyst to the litigation.
On the other hand, the court in previous decisions has not hesitated to express its opinion concerning the litigious and contentious behavior of the objecting executor, and its observations herein are not an attempt to make a quantum determination of fault but to indicate its dissatisfaction with the actions of all of the executors. Had the accounting executors immediately proceeded to account and wind up the administration of this estate, rather than permit time to pass without taking positive actions, this estate could have been terminated years ago.
However disposed the objecting executor was to litigation, he nonetheless faithfully appeared before this court, took the stand numerous times to offer information which he had, subjected himself to cross-examination and succeeded in bringing additional assets into the estate. The accounting executors, on the other hand, never made an appearance during the hearing of the objections. The evidence is clear that one of the account *53 ing executors, if not the alter ego of his father, was certainly the alter ego of the estate in that he was in effect the chief executive officer of some of the corporations in which the decedent had an interest. Since the decedent often owned property in the names of others and a great deal of inside information was necessary to determine the assets of his estate, it was necessary to take testimony to establish what interests the estate had in various corporations, real estate, manuscript rights, etc. Had the accounting executors, who obviously possessed a wealth of information, come forth rather than rely on third parties, whose knowledge of the facts was often secondhand, this accounting proceeding would have been less complicated and many of the questions raised by their brother readily answered.
In addition, the accounting executors often advanced the position of interest inimical to the estate rather than coming to its defense and thereby raised serious conflict of interest questions. This was especially so in regard to the bank claim, certain claims to real property, and the question of ownership of the Marquis James manuscript.
The foregoing observations should not be considered as a rebuff to the present attorneys representing the accounting executors. On the contrary, the court finds that more has been done since they have been retained to bring this estate to a conclusion than has been done in the past 19 years. They have co-operated in giving detailed information to all parties concerned and, by their actions, many of the objections can now be summarily disposed of. As stated above, these observations are not made to emphasize the accounting executors’ faults merely, but to point out that their assumption that the fault lies solely with their litigious brother is mistaken.
Under item 31 of Schedule A, the executors designate property as parcel “ J ” and indicate the estate’s interest as one quarter. The objectant contends the estate’s interest in the property is three quarters.
The executors take the position that they are not required to account for real property; that the issue involved was determined in a prior proceeding and the facts indicate that the estate has only a one-quarter interest.
Historically, title to real property did not pass to the personal representative upon qualification but the title thereto passed directly to the decedent’s distributees and devisees. Accordingly a fiduciary was not required to account for real property (Matter of Sergant, 62 Misc. 173; Matter of Green, 63 Misc. 638; 4 Warren’s Heaton, Surrogates’ Courts [6th ed.], § 351, par. l[a]; McKinney’s Cons. Laws of N. Y., Practice *54 Commentary to art. 13, EPTL 13-1.3). Changes, however, have occurred in our law relative to the powers of a fiduciary in disposing of real property, distributing it in kind and treating some real estate assets as personalty (EPTL 11-1.1; 11-1.5; 11-1.6; 11-1.7; 11-2.1, etc.; SCPA art. 19; EPTL 13-1.1; SCPA 2216). While the Temporary State Commission on Estates considered giving the personal representative title to all property of a decedent, this was abandoned in preference to other changes (33 Brooklyn L. Rev. 419 ; EPTL 13-1.3; EPTL 1-2.15) whereby the distinctions between personal and real property would be virtually eliminated. As Professor Hoffman stated in his commentary to EPTL 13-1.3 in McKinney’s, the historic principle is still viable. However, the changes in the law brought about by our modern society have caused its status to ebb.
If a fiduciary sells real property, he must account for the proceeds. If all or part of an interest in real property is owned by the decedent but title is in the name of another as the result of a joint venture, partnership agreement or merely an understanding with the decedent (for brevity all such arrangements are hereinafter referred to as partnership interests), it is doubtful if the historic rule vesting title in the decedent’s devisees or distributees should apply. Such an interest in real property should be marshalled and then distributed.
A surviving partner must ordinarily wind up the partnership account and distribute. Unless all the realty is sold, the surviving partner must distribute an interest in real property. The only logical person for the surviving partner to account to for such an asset, especially where title to the property is nominally held and there are many legatees and distributees who are warring with one another, would be the fiduciary of the decedent’s estate. While we need not go so far, as is done in England, and give title to real property to the personal representative, it would nonetheless be better practice to have him intervene and gain title for the devisees and distributees. The personal representative should pursue the estate’s claim by having the surviving partner account to him after the partnership is wound up so that the personal representative can distribute to the legatees, devisees or distributees (3 Harris, Estates Practice Guide [3d ed.], § 753). It would often be impractical in an estate such as the decedent’s to require the devisees or distributees to commence an independent action in another forum against the surviving partner or one holding property nominally. Accordingly the court finds there are instances where a fiduciary must account for real property.
*55 In the prior intermediate account by the two accounting executors herein, Michael P. Grace II filed objections to their account on July 13, 1955. Objection 1 dealt with real property listed under Schedule A and his objection was to the effect that the accounting executors listed the incorrect acreage and valuations of the parcels owned by the estate. Objection 4 dealt with the selling expenses for some of the property listed under Schedule A-l. Subsequently he reached an agreement with his brothers and entered into a stipulation wherein he consented to the withdrawal of his objections and a decree was signed by this court on June 25, 1963 settling the executors’ intermediate account. Nowhere in that prior proceeding did the court make a specific determination concerning the parcels of property involved.
The accounting executors take the position that the objections raised herein were previously raised by Michael P. Grace II in his objections of July 13, 1955, and that since a decree has been entered by the court settling the prior intermediate account, he is barred from raising the same objections. The law is clear that a Surrogate’s decree is conclusive as to all matters contained therein (Matter of Schaefer, 18 N Y 2d 314, and the authorities cited therein). However, a determination is made only of matters embraced in said account and decree (Matter of Williams, 1 A D 2d 1022), and the matters embraced include only those matters which are clearly and specifically set forth and can be ascertained from a reading of the account or decree (Matter of Seaman, 275 App. Div. 484; Matter of Lewin, 41 Misc 2d 72; Matter of Payne, 12 Misc 2d 861). There are situations where in spite of a prior decree, the court will consider an issue de novo (Matter of Zeh, 281 App. Div. 926; Matter of Alker, 20 A D 2d 894). The critical issue is whether the matter was expressly litigated and determined or could have been litigated and determined, and the failure to do so would bar future litigation on the issue (Matter of Jones, 13 Misc 2d 678, affd. 8 A D 2d 829). The court finds that no determination was made by this court concerning the exact parcels of property and interest therein owned by the decedent so as to preclude the court from making a determination at this time. The prior decree merely dealt with an intermediate account and the agreement reached by the parties concerning certain limited objections that they had to the account. Certainly, if an asset exists and was not previously accounted for, it must be accounted for at this time, especially where the rights of those under a disability are involved.
*56 The court finds that the parcel in question was purchased on or about February 7, 1927 by one George Edward Kent. The court also finds from Exhibit"45 and other testimony and exhibits that the record title, although solely in the name of George Edward Kent, did not represent the true ownership of such parcel. Mr. Kent entered into an agreement with the decedent and one Louis deLancey Ward wherein the true ownership of the parcel was that the decedent held a one-half interest in the property and Mr. Kent and Mr. Ward each owned a one-quarter interest in same.
On December 8, 1932, the decedent sold his one-half interest in the parcel in question to his wife for $26,399.38. It was the practice of the decedent to set forth his interests in various assets on the books and records of corporations which he controlled. The books and records kept by W. K. Grace & Co. of both the decedent and his wife clearly evidence that the decedent conveyed his one-half interest to his wife and that the decedent’s widow paid the taxes for the one-half interest in said parcel of property. The books and records of the corporation also indicate that subsequently the decedent purchased Mr. Ward’s one-quarter interest in the property (this is also evidenced by Exhibit 45) but it would appear that the assignment or quitclaim deed signed by Mr. Ward was not recorded. At the time of the decedent’s death in 1950, the record owner was still George Edward Kent. Subsequently, in July of 1959 the executor of the estate of George Edward Kent conveyed to the decedent’s executors a three-fourths interest in the parcel in question. The other one fourth was conveyed to the heirs of Mr. Kent. From all of the facts before the court, it would appear that the within estate owns a one-fourth interest in the property and that another one half which was conveyed by Mr. Kent’s executor belongs to the estate of Janet Grace. It should be noted that the estate tax proceedings in the within estate listed the interest in the parcel in question as a one-fourth interest and the tax proceedings in the estate of Janet Grace sets forth that the estate owns a one-half interest in the parcel in question.
Accordingly, the objection is dismissed as to the contention that the estate owns a three-fourths interest in said property but the executors are to account for a one-fourth interest in the property in question. Since the estate of Janet Grace is pending before this court, and, if there be no objections by the - fiduciaries in that estate as to the claimed interest that the Janet Grace estate has in the afore-mentioned real property, *57 the executors of the within estate should execute a deed conveying a one-half interest to the estate of Janet Grace.
Supplemental objection 7 deals with a claim presented by the Marine Midland Grace Trust Company for services allegedly rendered to the estate for the period January 1, 1960 to the present. This claim is not set forth in the final account filed with this court but appears for the first time in an affidavit bringing the account down to date. The guardian ad litem has noted that the claimant prepared the prior account without setting forth this claim. The bank states that it did not interpose the claim originally because it had hoped the estate would be quickly wound up, and it did not want its claim to delay matters.
Exhibits 17 to 19 indicate that the bank agreed with the two accounting executors to a certain percentage fee for services rendered on behalf of the estate. The agreement states that the bank would be paid an additional sum for any special services necessary. In accordance with the agreement, the bank has been paid for normal services but it claims a great deal of special services were also rendered for which it seeks additional compensation. It alleges the special services dealt with the preparation of documents, voluminous correspondence, conferences with the executors, attorneys and guardians ad litem, and work regarding the tax refund case. It claims 1,000 hours at $22 an hour, or a total of $22,000. The bank alleges that services in excess of those set forth were rendered but it is not including them in its claim.
There is testimony that the two accounting executors knew the bank would not present its claim until the final accounting and the decision to make the claim was made by officers of the bank sometime around September or October, 1968.
In reviewing the bank’s claim, the court finds that some of the services dealt with trusts and not the within estate. Needless to say, the court will not make any allowance in this proceeding for services to the trusts.
A fiduciary can employ agents to do work he legitimately cannot do himself. However, lack of performance is not excused because an executor is actively engaged in intricate corporate affairs. To qualify as a fiduciary is a serious matter and if one lacks the time or inclination necessary to devote to the affairs of an estate, he should refrain from accepting his nomination or resign. The facts in each estate will determine whether or not the retention of agents is warranted (Third Report of Temporary State Comm, on Law of Estates; N. Y. *58 Legis. Doc., 1964, No. 19, App. M, Report No. 6.4C, p. 506). The law is clear that if a fiduciary rightfully delegates some of his executorial work to subordinates, he should be prepared to pay for such ministerial services out of his commissions (Matter of Lester, 172 App. Div. 509 ; Matter of Brodbeck, 123 Misc. 743 ; Matter of Musil, 168 Misc. 529), even if they are men of affairs (Matter of McDowell, revd. other grounds 178 App. Div. 243). Normally the payment would be made out of the commissions allowed to the fiduciary. Since the executors waived commissions, the court must make a determination whether the bank is entitled to its own claim against the estate. The court will normally allow the withdrawal of a unilateral waiving of commissions (Matter of Weiss, N. Y. L. J., Feb. 6, 1968, p. 21, col. 6) but a withdrawal cannot be made if it was subject to a prior agreement or if the waiver was continuous (Matter of Appenzellar, 52 Misc 2d 173; Matter of Vesell, 1 Misc 2d 682). In the settlement of the prior intermediate account the executors waived commissions and the special guardian in those proceedings withdrew an objection concerning the failure of the fiduciaries to invest over $200,000 for a period in excess of a year because the executors were willing to waive commissions.
On page 291 of the trial minutes, the attorneys for the accounting executors make their position clear that the bank’s claim is not for work done for the executors but work done for the estate, and accordingly the court will make its determination on the basis of same.
As the court said above, all of the executors were entitled to all the books and records of the corporation. Some of the special services alleged to have been performed by the bank dealt with senior bank officers presiding over the review of the books and records by the objecting executor and his attorneys. Ordinarily such services would not be a proper charge against the estate. However, as a result of the antagonisms that existed among the three brothers and the actions of each as expressed in the preface of this decision, the bank had to supply information to numerous attorneys representing the objecting executor. Under such circumstances, an allowance should be made and paid for out of the share of the estate that is to be ultimately distributed to the three executors individually' (Matter of Gould, 9 A D 2d 916). Accordingly the court allows the bank a total of $3,000 (without prejudice to any other"' possible claims that the bank may have against the two accounting fiduciaries individually) to be paid out of the funds of the three executors equally.
*59 There are instances where the court can make an allowance out of estate assets for special services rendered by a bank (Matter of Ducas, 109 N. Y. S. 2d 17, affd. 279 App. Div. 730; see, also, the fourth paragraph of article Tenth of the decedent’s will). The court finds that there was such work concerning preparation of complicated tax returns, information dealing with the tax refund case, investigation concerning the complicated handling of the decedent’s real estate transactions, etc., and allows the bank $5,000 payable from the estate generally and inclusive of any payments previously made for such special services out of estate assets for the period January 1, 1960 to the present.
The guardian ad litem objects to the account on the ground that the accounting fiduciaries have failed to include interest on debts that Joseph P. Grace, Jr., and Michael P. Grace II owe to the estate. All parties concerned concede the debts and Joseph P. Grace, Jr., agrees to pay interest from January 1, 1960 but does not agree to pay any interest from the date of the decedent’s death up to January 1, 1960. It is his contention that the prior intermediate accounting decree precludes any claim for interest due and owing on said claim during the time in question. The guardian ad litem claims that interest is due and owing from the date of the decedent’s death. The objectant Michael P. Grace II agrees with the position taken by the guardian ad litem.
There was no evidence submitted to the court during the trial to indicate specifically how the indebtedness was incurred but in reviewing a prior report of the guardian ad litem the court notes that the decedent evidently sold certain furniture to his sons for $61,587.13, represented by a bill of sale dated July 1, 1942. The decedent made notations in his personal records regarding the indebtedness and payments made by his sons during his lifetime. The court accordingly finds that the indebtedness was due and owing at the time of the decedent’s death.
Since there was no determination of these debts or questions of interest in the prior decree, the intermediate account does not bar the guardian ad litem from objecting to the failure of the fiduciaries to include interest from the date of death. Since the obligations were due and owing at the time of death and were not demand notes, interest is due and owing from the time of the decedent’s death (2 Harris, Estates Practice Guide [3d ed.], § 417). In researching this objection, the court has found earlier authority to the effect that interest on a claim *60 continues only for one year after the issuance of letters testamentary (Leask v. Hoagland, 136 App. Div. 658; Cammann v. Whittlesey, 70 App. Div. 598, affd. without opn. 173 N. Y. 618; 7 Warren’s Heaton, Surrogates’ Courts [6th ed.], § 56, par. 2). The court finds that said authority no longer applies and that interest on debts is presently controlled by article 50 of the CPLB (see Matter of Lipsit, 21 A D 2d 509; SCPA 102).
All parties have indicated that the rate of interest to be applied on the outstanding obligations should be based on the rates obtained on Government bonds held by the fiduciaries during the period of administration. The court finds that the indebtedness is charged with &% interest and not the rate suggested by the parties herein (3 Warren’s Heaton, Surrogates’ Courts [6th ed.], § 278, par. 4; Matter of Lipsit, supra). Accordingly the objection of the guardian ad litem is sustained and the accounting fiduciaries are to modify their account accordingly.