**A.F.L. FALCK, S.p.A., Plaintiff,**

v.

**E.A. KARAY COMPANY, INC., Defendant.**

**No. 85 Civ. 1998 (RWS).**

United States District Court, S.D. New York.

June 10, 1986.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for plaintiff; Alan Mansfield, of counsel.

Engel & Mulholland, New York City, for defendant; James G. McCarney, of counsel.

SWEET, District Judge.

Defendant E.A. Karay Company, Inc. ("Karay"), a New York buyer, has moved for summary judgment to dismiss the complaint of plaintiff A.F.L. Falck, S.p.A. ("Falck"), an Italian seller, which seeks recovery of $704,343 for goods sold and delivered. Falck cross-moved to dismiss Karay's defenses of accord and satisfaction, set-off, fraud and reformation. On the basis of the facts and conclusions set forth below, Falck's cross-motion is granted and Karay's motion for summary judgment denied.

**Prior Proceedings**

These crossing motions for summary judgment have followed after the filing of the complaint on March 14, 1985 and the completion of discovery. Both parties seek a resolution of their dispute, each maintaining that the facts supporting their respective positions are not in dispute while claiming a dispute as to the facts relied upon by their opponents. An examination of the Rule 3(g) statements as reflected in the facts stated below, reveals no factual dispute, that is, no dispute as to the past events, but rather the inference to be drawn from these facts.

**The Issues Presented**

Falck and Karay in 1981 and 1982 had an established course of dealing in steel pipe

known as oil country tubular goods ("OCTG") manufactured by Falck and used in the oil and gas industry. In 1982 Karay fell behind in its payments, disputes arose as to the fitness of the goods shipped. In 1983 the parties sought to resolve their differences and Falck agreed to take back certain quantities of OCTG. A portion of the dispute remains and has given rise to this action and the pending motions.

### Facts

Falck is a corporation organized and existing under the laws of Italy with its principal place of business in Milan, Italy and acted in its own behalf or through its authorized agent, Joseph J.C. Hoo, president of Falck Steel, Inc. ("Hoo"), Falck's American affiliate. Falck is engaged in the manufacture and sale of steel products throughout the world.

Karay, a New York corporation with its principal place of business in New York, New York, is a trading company engaged in the business of buying steel products for sale to its customers. During the time period relevant to this action, a number of Karay's domestic customers were engaged in oil drilling and related businesses in Texas.

In 1981, Karay ordered in excess of $5 million of tubular steel products from Falck under its purchase order No. 160, which order was amended from time to time with respect to quantity and size of the tubular steel products which would ultimately be processed for use in oil well casings and related oil business activities. The tubular steel products were purchased by Karay for resale or for its own account. The purchase order provided for several shipments of the tubular products to be made from Milan, Italy to the Port of Houston in Houston, Texas. In accordance with standard commercial practice, the agreement between Falck and Karay called for payment terms on a cash-against-documents basis: Karay or its agent would receive shipping documents (bill of lading, packing slip, and so forth) necessary to release the goods from the carrier at the Port of Houston upon payment of Falck's invoices.

In or about the fourth quarter of 1981, Falck began shipping OCTG pursuant to purchase order No. 160. Karay asked for payment terms permitting Karay to take possession of the OCTG on credit terms. Falck agreed to such a modification. By March, 1982, Karay owed Falck $3,314,-715.29 for OCTG sold and delivered by Falck to Karay at the Port of Houston.

Thereafter, Falck and Karay entered into an agreement (the "1982 Redelivery Agreement") pursuant to which Falck agreed to accept redelivery of any OCTG for which Karay had not received payment and to pay any trucking, storage and processing charges incurred for the OCTG redelivery to it. Karay agreed to assist in arranging redelivery of such OCTG. By May of 1983, Falck credited Karay $2,316,066.09 for OCTG redelivered as per the 1982 Redelivery Agreement, leaving an outstanding balance of $998,649.20.

Among Karay's customers for OCTG supplied pursuant to purchase order No. 160 were Texas Upsetting & Finishing, Inc. ("Texas Upsetting"), General Pipe & Supply, Inc. ("General Pipe") and American Pipe Threaders. Falck had no contractual relationship with any of Karay's customers, and Karay never advised Falck of the terms of its resale agreements with its customers.

In or about the beginning of 1982, Texas Upsetting's principal, John Boyd, notified Karay that certain of the Falck origin steel which Texas Upsetting purchased from Karay had alleged manufacturing defects. Karay informed Falck of this claim, and, in accordance with Falck's practice, Falck sent its American agent Hoo, and a representative from its mill in Milan, Italy, to Texas for an on-site inspection which according to Falck revealed that approximately 5% of the pipe had manufacturing defects which would require correction and that the rest of the material was not defective. On or about March 23, 1982, Texas Upsetting sent three invoices to Karay for "Cost of Services to Cure Mill Defects"

amounting to $268,688.56, presumably the amount of its order. Karay in turn sent these invoices to Falck and requested a credit in the same amount.

On receipt of these invoices, Falck, by letter addressed to Texas Upsetting dated March 30, 1982, copied to and received by Karay, rejected the requested credit. Hoo explained that the invoices assumed that 18″ was cut off both ends of all the steel pipe Texas Upsetting purchased from Karay, even though "only a small portion of the pipes" was found to need such correction. In a March 30, 1982 letter, Hoo stated: "Please review the data on your invoices and submit to us the proof for the number of pipes that were actually cut back for treading." Neither Karay nor Texas Upsetting provided the requested information. On September 3, 1982, Hoo wrote to Karay stating: "Since the sum of your total unpaid invoices is $3,314,715.29 even counting the $268,688.56 that Texas Upsetting and Finishing, Incorporated is charging you for the alleged mill defects (which we are taking separate action with Texas Upsetting and Finishing Incorporated) the difference between what you owe us and what we have taken back is still very large."

On or about February 2, 1982, Robert White, a principal of General Pipe, informed Karay that it rejected as defective part of Karay's shipments of Falck origin steel which Karay had sold and delivered to General Pipe. After notifying Falck of the alleged defect, Karay attempted to arrange for Karay and Falck to conduct an on-site inspection. General Pipe refused to cooperate with Karay and Falck, and no such inspection was permitted. By letter dated March 17, 1982, Karay memorialized its unsuccessful efforts in arranging an inspection with General Pipe, and concluded:

> As we have not received any reply, we assume that there is no quality problem or that you are not interested in discussing it any further. We cannot accept, therefore, any further delay in payment due to an alleged quality problem.

Falck also took back as part of the 1982 Redelivery Agreement OCTG that Karay had purchased for resale to Wilson Pipe. By letter dated July 14, 1982, Karay forwarded five invoices issued by Houston Port Transit Services for hauling and storing this pipe. The letter erroneously stated that Karay had paid $417.55 toward these invoices but by letter dated August 10, 1982 (Exhibit S), Karay advised Falck of the error and stated that the correct amount paid by Falck was $3,275.19 (the total of invoices 5550 and 5655) and that that amount was being applied against the outstanding indebtedness. Pursuant to the August 10 letter, the remaining three invoices were forwarded to Falck for payment.

In early 1981, Karay sent Falck origin steel to American Pipe for processing and storage. American Pipe issued invoices to Karay for $36,621.41 in connection with the Falck material which was redelivered to Falck, which invoices Karay sent to Falck under the 1982 Redelivery Agreement, together with letters dated June 17 and 24, 1982 requesting a credit for this amount.

A telex sent from Falck Milano to Falck USA dated April 26, 1983 (Exhibit F) states "We accept the claim for American Pipe Threaders but have not means to control that Doll. 39621,41 is the exact amount." While Falck Milano may not have been informed of the invoices furnished by Karay, its U.S. agent received the invoices and examined them for accuracy.

On May 3, 1983, Falck and Karay entered into a letter agreement in which both parties agreed on the amount of unpaid invoices issued from Falck to Karay, the value of returned material, payments made by Karay to Falck, miscellaneous adjustments and amounts in dispute with Texas Upsetting, General Pipe and American Pipe. After agreeing to various offsets and adjustments, the parties agreed that, aside from the amounts in dispute, Karay owed Falck $220,420.73. The letter which is attached as Appendix A,* made refer-

*Ed. note:* Not included in for purposes of publi-     cation.

ence to $704,343.00, the sum sought in this lawsuit. The letter provided for a payout of the $220,420.73 less an agreed upon credit of $126,155.98. Falck stated that it would give Karay "temporarily the full credit" for the disputed claims and that it would advise Karay as to its position as to the disputed claims after consultation with counsel.

The parties met again in September in an inclusive effort to resolve the so-called disputed amounts. Thereafter Karay made initial payments under the payout schedule and asked that Falck agree to the following additional credits against Karay's outstanding balance under purchase order 160: $268,688.56 (Texas Upsetting), $395,615.49 (General Pipe), $39,621.41 (American Pipe Threaders) and $417.55 (Houston Port Transit). Also, prior to December 7, 1983 Karay advised Falck that it would not agree to pay its outstanding balance under purchase order 160 unless Falck stated in writing that it would not hold Karay liable for the "disputed" amounts. Falck declined the request.

Between May 3 and December 7, 1983, Falck and Karay agreed that Karay was entitled to the following additional credits against its outstanding balance under purchase order 160: $17,075.38 (Tech Steel), $36,810.09 (duties and clearing charges paid by Karay), $126,155.98 (commission) and $55,000 (payments made by Karay in November, 1982 and September, October and November, 1983).

On December 7, 1983 Falck's authorized agent, Hoo, sent the following letter to Karay:

This is to confirm our agreement of our meeting in August 1983 in your office that according to our letter to you dated May 3, 1983, and confirmed by Mrs. Irene Greco, that you owe us a balance of

|  | |
|---|---:|
| | $220,240.73 |
| We owe you, however, a commission of | 126,155.98 |
| Balance due to us | 94,264.75 |
| Payments received | 35,000.00 |
| Outstanding balance is | $ 59,264.75 |

It is agreed you will complete this payment before February 15, 1984.

We reserve the right to pursue legal action against Texas Upsetting, General Pipe and Supply and American Pipe Threaders. The amount in dispute are listed in the letter from us to you dated May 3, 1983.

As Hoo put it in his November 1, 1983 letter seeking authority for his December 7 letter, "One must use a long fishing pole to catch a big fish." Falck subsequently paid the "outstanding balance" listed in the December 7 letter of $59,264.75 with four checks. The final installment ($14,024.75) was paid by check accompanied by a letter stating: "We enclose herewith our check No. 15071 for $14,204.75 representing complete and final settlement of the amount we owed you as per your letter dated December 7, 1983." On the back of the final check Karay endorsed "Complete and final settlement of amount due by E.A. KARAY COMPANY, INC. as agreed and confirmed by FALCK STEEL's letter of December 7, 1983." Falck accepted all four checks paid by Karay pursuant to the December 7, 1983 letter and cashed them without protest.

After Karay finished making payments towards the undisputed balance in May, 1984, Falck reiterated in November, 1984, that Karay was fully responsible for the amounts in dispute but advised Karay that it would delay suit against Karay if Karay advised of its progress in recovering from its customers.

In or about February, 1985, Karay instituted a lawsuit in the Texas State Court against General Pipe to recover damages of $356,293.49. In or about February, 1985, Karay also made a claim in consolidated involuntary bankruptcy cases involving Robert K. White, debtor (Case No. 85–00594–HI–4, U.S.B.C., S.D.Tex.) and General Pipe & Supply, Inc. debtor (Case No. 85–00595–HI–Y, U.S.B.C., S.D.Tex.) in the same amount plus interest and attorney's fees arising out of General Pipe's wrongful refusal to pay Karay for Falck origin mate-

rial which was sold and delivered by Karay to General Pipe.

On February 5, 1985, James Karayannides ("Karayannides"), president of Karay, executed a sworn affidavit in connection with the aforementioned bankruptcy cases in which he attested:

> Therefore, following delivery of the tubular goods to the Lakewood Pipeyard in Houston, Harris County, Texas, General Pipe (i) did not return the tubular goods to Karay, (ii) did not pay for the tubular goods, and (iii) did not release the tubular goods back to Karay. Karay has made demand upon General Pipe that General Pipe either (a) return the tubular goods, or (b) pay for them in accordance with the parties' original agreement, but General Pipe has not honored such demand.

On or about February 4, 1985, Karay learned that a third party had taken the Falck origin steel from the Lakewood yard where it had been stored by General Pipe since its sale and delivery by Karay to General Pipe in 1982. Karay telexed General Pipe and advised:

> 1,338 joints, 4½" × .250" N80 seamless steel pipe.
>
> Above captioned pipe now located at Pipe Threaders, Bay Town Tx. You have not paid us for this pipe and if further moved such will constitute conversion of our property with all legal recourse following. Very truly yours, Mark G. Hero.

At no time did Falck ever accept Karay's request for a credit of $395,615.48 relating to General Pipe's allegation of defective material.

Falck thereafter advised Karay it would be held responsible for the disputed claims, and this action followed.

## Conclusions

The amount in controversy exceeds $10,000 exclusive of interests and costs. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), and venue is appropriate in this district pursuant to 28 U.S.C. § 1391(a).

Central to the dispute are the two letters of May 3, 1983 and December 7, 1983. The negotiation of Karay's checks by Falck with the legend "Complete and final settlement of amount due by E.A. Karay Company, Inc. as agreed and confirmed by Falck's Steel's letter of December 7, 1983" does not in itself constitute a release. Notwithstanding the notation on the final check cashed by Falck, the plain language of the endorsement makes clear that Falck's claim regarding the disputed sums remained intact. The notation refers to Falck's letter to Karay of December 7, 1983 which in turn referred to and incorporated its letter of May 3, 1983. It is well established that where a contract is in several parts, all must be read together to establish the parties' intent. *See Madawick Contracting Co. v. Travelers Insurance Co.*, 307 N.Y. 111, 118, 120 N.E.2d 520 (1954); *Dietrich v. Chemical Bank*, 115 Misc.2d 713, 454 N.Y.S.2d 490, 491 (Sup.Ct.N.Y.Co.1981), *aff'd*, 92 A.D.2d 786, 459 N.Y.S.2d 1016 (1st Dep't.1983); *see generally* Corbin on Contracts, § 512.

The May 3, 1983 and December 7, 1983 letters provide "temporary credit" for the amounts both parties agreed were "in dispute." Falck gave no written or oral indication of a willingness to relinquish any part of the disputed portion of the claim, and in fact affirmatively refused to provide Karay with a requested letter to that effect.

As this court ruled in *Studiengesellschaft Kohle v. Novamont Corp.*, 532 F.Supp. 234, 238 (S.D.N.Y.1981), *rev'd in part, on other grounds*, 704 F.2d 48 (2d Cir.1983): "In the absence of any expression of intent by the parties to enter into an accord and satisfaction, SGK is not entitled to prevail on this defense." (citations omitted). Similarly, in *Glen Navigation Corp. v. Trodden*, 97 N.Y.S.2d 228 (City Ct.1950), plaintiff, in a letter, demanded the balance of payment after accepting a check for payment of the liquidated part of the claim. The fact that there was no written indication of an intent to relinquish the disputed claim, and that there was a letter to show intent to collect on it, prevented the finding of an accord and satisfaction. *See also*

*Manley v. Pandick Press, Inc.,* 72 A.D.2d 452, 424 N.Y.S.2d 902 (1st Dept.1980).

Under the parties' May 3, 1983 agreement, the $220,420.73 represented the agreed-upon balance which Karay undisputedly owed Falck. That balance was reached by listing and then temporarily setting aside the amounts in dispute, the amounts which form the basis of this lawsuit. The Falck December 7, 1983 letter reconfirms the results of the parties' September 2 meeting, after which Karay paid Falck $35,000 toward the undisputed balance. After making "on account" payments toward reducing the undisputed balance, Karay sought from Falck a release from liability with respect to the disputed claim. Falck refused to provide such a release and sent the December 7, 1983 letter stating a $59,264.75 balance on the agreed-upon credits followed by: "The amount in dispute [sic] are listed in the letter from us to you dated May 3, 1983."

Hoo at this point intentionally or otherwise fostered the ambiguity latent in the language concerning legal action "against" Texas Upsetting and General Pipe. What he sought to achieve was as rapid a payment as possible of the undisputed amount without jeopardizing that payment by insisting on the open items. The letter of December 7 was Hoo's "long fishing pole." Although he came as close as he dared, Hoo did not release Falck's claims for the disputed items.

"The purpose of a written agreement must be ascertained from the instrument itself, if it is possible to do so, but where there are additional writings relating to the subject, they may be examined to ascertain the intention of the parties at the time of the making of the contract. *Extrinsic matters such as letters and other instruments may be construed as a part of a contract where they are referred to therein or annexed thereto, or where it appears they were intended to be a part of the contract."* Hallmark Synthetics Corp. v. Sumitomo Shoji New York, Inc., 26 A.D.2d 481, 275 N.Y.S.2d 587, 590 (1st Dep't 1966) (citations omitted and emphasis added), *aff'd,* 20 N.Y.2d 871, 285 N.Y.S.2d 615, 232 N.E.2d 646 (1967); *see also Lowry & Co. v. S.S. Le Moyne D'Iberville,* 253 F.Supp. 396, 398 (S.D.N.Y.1966) (Weinfeld, J.) ("It is not necessary, in order to incorporate by reference the terms of another document, that such purpose be stated in haec verba or that any particular language be used.") Both letters should be read together to construe the parties' intentions. *See, e.g., Lane Const. Corp. v. Winona Const. Co. Inc.,* 49 A.D.2d 142, 373 N.Y. S.2d 882, 886 (3d Dep't 1975); *Paley Associates, Inc. v. Universal Woolens, Inc.,* 446 F.Supp. 212, 214 (S.D.N.Y.1978) (reference to another writing sufficiently described in a writing incorporates that writing).

Karay seeks to rely on GOL § 5–1103 which provides, in part, that an "agreement, promise or undertaking to change or modify, or to discharge in whole or in part, any contract" is valid even absent consideration. However, there is simply nothing in the December 7, 1983 letter which discharges in whole or in part Karay's obligations with respect to the disputed sums. Moreover, Karay's subsequent conduct belies the existence of an alleged prior contract in which its obligations to Falck were released. *See* 1 Corbin, Contracts §§ 95, 101 (1963) (subsequent conduct of parties relevant to determine question of whether a contract had been formed).

To prove a release, an obligor must demonstrate that there exists a writing which contains an "explicit, unequivocal statement of present promise to release [the obligor] from liability." *Carpenter v. Mac-Hold,* 86 A.D.2d 727, 447 N.Y.S.2d 46, 47 (3d Dep't 1982). No release will be found if the words fail to manifest the alleged releasor's intent to discharge. *Gordon v. Vincent Youmans, Inc.,* 358 F.2d 261, 263 (2d Cir.1965) (applying New York law). Under this standard, the December 7, 1983 letter cannot be considered a valid release.

As Circuit Judge Edward J. Lumbard stated while sitting in the District Court, "the matters embraced by a release provision include only those things 'which are clearly and specifically set forth and can be

ascertained from a reading of the account...." *Public Service Company of Colorado v. Chase Manhattan Bank, N.A.*, 577 F.Supp. 92, 109 (S.D.N.Y.1983) (*quoting Matter of Grace*, 62 Misc.2d 51, 55, 308 N.Y.S.2d 33 (Sur.Ct.1970). Critical to finding a valid accord or release is that the creditor evidenced an intent to accept a new promise as a satisfaction of the prior obligation. *Werking v. Amity Estates, Inc.*, 2 N.Y.2d 43, 155 N.Y.S.2d 633, 641, 137 N.E.2d 321, 326 (1956). The payment of amounts concededly due fail to constitute such a new promise. Karay's affirmative defense alleging that the December 7, 1983 letter constitutes an accord or release must, as a matter of law, be stricken.

■ In the Redelivery Agreement, Falck agreed to pay the trucking, storage and processing charges for OCTG returned to it by Karay. The proof established the propriety of the credits requested by Karay for the OCTG redelivered to Falck from American Pipe Threaders and Wilson Pipe. As to these redelivery charges incurred by Karay in connection with the return of the American Pipe Threaders OCTG and the goods destined for Wilson Pipe, Karay properly accounted for these charges to Falck, and these amounts incurred in redelivery are properly offset against Karay's liability.

However, Falck is entitled to summary judgment in its favor on the disputed amounts of the General Pipe and Texas Upsetting shipments. The New York Uniform Commercial Code ("UCC") codifies a seller's action to recover its contract price for goods sold and delivered. UCC 2–709(1)(a) specifically provides:

(1) When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages ... the price

(a) of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer.

Falck sold and delivered steel to Karay on an agreed upon price. Falck's performance under purchase order 160 was complete on delivery and, under UCC 2–709, Karay's acceptance of the steel entitles Falck to its price. *See* UCC 2–709, Annotation ("liability for the price hinges upon acceptance rather than upon title ..."); *see also* UCC 2–709 Official Uniform Comment 1. ("Neither the passing of title to the goods nor the appointment of a day certain for payment is now material to a price action.")

The UCC provides that goods are accepted when the buyer:

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

UCC 2–606(1)(c).

With respect to material relating to General Pipe and Texas Upsetting, Falck's goods were accepted by Karay and sold to its customers, who thereupon took possession and title. Falck's right to maintain an action for the purchase price attached upon Karay's refusal to make the required payment. *See Singer Co. v. Alka Knitting Mills, Inc.*, 41 A.D.2d 856, 343 N.Y.S.2d 146 (2d Dep't 1973). In *Kesco Textile Company, Inc. v. Coit International, Inc.*, 41 A.D.2d 828, 343 N.Y.S.2d 1 (1st Dep't 1973), *aff'd*, 34 N.Y.2d 700, 356 N.Y.S.2d 616 (1974), a seller of textiles sued a buyer who complained of defects in the goods yet kept and used 126 of 312 pieces. The seller's offer to inspect the entire shipment for defects was refused by the buyer, who instead stored the goods claimed to be defective at the seller's expense. The First Department held that the buyer's actions constituted acceptance under UCC 2–606, thereby establishing liability for the price of the goods.

Once goods are accepted, the buyer has the burden of proving them defective. UCC 2–607(4). Moreover, UCC 2–605 provides that:

(1) The buyer's failure to state in connection with rejection a particular defect which is ascertainable by reasonable inspection precludes him from relying on

the unstated defect to justify rejection or to establish breach

(a) where the seller could have cured it if stated reasonably; or

(b) between merchants when the seller has after rejection made a request in writing for a full and final written statement of all defects on which the buyer proposes to rely.

■ Even if there were defects in the General Pipe & Supply goods—a proposition even Karay rejects—the UCC § 2–515(a) provides that a seller has the right to inspect goods sold in the event there is any claim or dispute:

either party on reasonable notification to the other and for the purpose of ascertaining the facts and preserving the evidence has the right to inspect, test and sample the goods including such of them as may be in the possession or control of the other.

Indeed, Karay's failure to permit inspection (or otherwise particularize allegations of defect) effectively deprived Falck of its additional statutory right to cure under 2–508. *See, e.g., Pronti v. DML of Elmira, Inc.,* 103 A.D.2d 916, 478 N.Y.S.2d 156, 157 (3d Dep't 1984) ("Moreover, plaintiff's refusal to permit Henredon to correct the alleged defects stripped them of any remedy against the defendant for breach of any express warranty …").

■ Similarly, the facts establish Falck's entitlement to the Texas Upsetting amounts, and Karay has failed to raise a triable issue of fact which would prevent summary judgment in Falck's favor on this issue. Karay does not dispute that it sold OCTG steel to Texas Upsetting, that Texas Upsetting informed Karay that there were alleged defects in the pipe, namely that the steel had "hooks" which needed correction. Falck and Karay made an on-site inspection and determined that no more than 5% of the Falck origin OCTG was defective.

After this inspection, Texas Upsetting charged Karay with three invoices for "costs of service to correct mill defects" which assumed that 100% of the pipes required correction and demanded a credit of

$268,688.56. By letter of March 30, 1982, Falck advised Karay and Texas Upsetting that, in light of the inspection's determination that only 5% of the pipe was damaged, Falck would not give credit for the amount unless it was with provided proof that these corrections were made. To this date neither Texas Upsetting nor Karay has documented these repairs, and Falck has refused the credit.

In an effort to forestall summary judgment, counsel for Karay has alleged that the 5% number is "suspect," however, Karay has not produced a single invoice for pipe repair, a competing pipe damage assessment, or any evidence which indicates that Karay did not agree with Falck's estimate of the damage, which was evaluated jointly by Falck and Karay in Texas. Karay has not controverted Falck's understanding that the $268,688.56 figure represents a bill for repairing 100% of the pipe sent to Texas Upsetting, and has not contested Falck's assumption that the offset claimed equals the value of the entire amount of steel shipped to Texas Upsetting. While Karay is entitled to 5% of these repair costs or $13,434.43 as an offset, a balance of $255,234.13 is owing to Falck.

Therefore, partial summary judgment is appropriate, granting Falck the relief it seeks with respect to the $395,615.48 it claims for OCTG delivered to General Pipe and the $255,234.13 it seeks for the OCTG delivered to Texas Upsetting, less the offset properly allowed to Karay in the amount of $39,621.41 for the American Pipe Threaders invoices and $3,275.19 for the Houston Port Transit credit.

IT IS SO ORDERED.